# G. A. STEWARD v. STATE.

No. A-1376. Opinion Filed May 3, 1913.

(131 Pac. 725.)

1. HOMICIDE—Appeal—Error Favorable to Defendant. When the court submits the issue, and the jury finds the defendant guilty of manslaughter in the second degree, in a case where the law and the facts make the crime murder or manslaughter in the first degree, it is an error in favor of the defendant, of which the law will not take cognizance, and of which the defendant cannot complain.

2. APPEAL AND ERROR—Presentation Below—Necessity. Error can be made available on appeal only by exceptions duly taken on the trial.

(Syllabus by the Court.)

*Appeal from District Court, Pontotoc County;*
*Tom D. McKeown, Judge.*

G. A. Steward was convicted of manslaughter in the second degree, and he appeals. Affirmed.

*W. T. Anglin* and *Crawford & Bolen,* for plaintiff in error.
*Chas. West,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen., and *Jos. L. Hull,* Spec. Asst. Atty. Gen., for the State.

DOYLE, J. The plaintiff in error, hereinafter called the defendant, was convicted of manslaughter in the second degree in the district court of Pontotoc county on an information filed in said court February 3, 1910, charging him with the murder of one D. T. Gray in said county on or about the 24th day of December, 1909, and in accordance with the verdict of the jury he was sentenced to imprisonment in the penitentiary for a term of three years. The judgment and sentence was entered March 14, 1911. An appeal was perfected by filing in this court September 13, 1911, a petition in error with case-made.

The facts of this case so far as deemed material to a proper understanding of the questions presented are as follows: It appears from the record that the defendant was a physician with an office in the town of Allen. The killing occurred in the defendant's office on Christmas Eve; the deceased was shot with a 45-caliber pistol; the bullet entered 2½ inches below and back of the left nipple, and came out 3 inches below the right shoulder blade.

Three persons besides the defendant and the deceased were in the room at the time; of these two testified for the state and one for the defendant.

Jim Story testified: That he went with the deceased to Dr. Jones' office, and there found Dr. Jones, Julian Donaghey, and the defendant. That there was a double-barrel shotgun on a table in the room, and the defendant was sitting behind the table. The deceased remarked, "Seems like you are having a jubilee up here." The defendant said, "I have a right to pro-

tect my house;" and the deceased answered, "I do not blame you; I would too." The defendant then jumped up, and came out with a six-shooter, and the deceased said, "Don't shoot me, Doc.," and walked towards him. The defendant struck the deceased with the six-shooter, and deceased picked up the shotgun, and witness knocked it out of his hands on the floor. Donaghey said, "Jim, you are going to get shot;" and witness got from between them. The defendant and the deceased were then scuffling over the six-shooter; the deceased, holding the muzzle, shoved the defendant down, and the gun went off. The deceased let go of the pistol and grabbed the shotgun, holding the muzzle toward the defendant. The defendant then fired again, and the deceased said, "You have killed me," and lay down and died in a few minutes. The deceased was unarmed. He further testified that the deceased had not made any move to do the defendant any harm at any time before the defendant drew the pistol.

Julian Donaghey testified that he was sitting in the office when Jim Story and the deceased came in, and his testimony was in substance the same as that of witness Jim Story.

Nute Smith, Ebb Ashford, and Ira Singleton testified that they were in the defendant's office a short time before the killing, and Ashford picked the shotgun from the table, and the defendant said "not to be monkeying with it," and took the gun from him, and broke it, and a shell fell out on the floor. The defendant picked the shell up, and put it in his pocket, and breeched the gun; that they were drinking whisky, and the defendant ordered them out of his office, and pushed Nute Smith down the stairs; that they went into a pool hall, and told the deceased about the trouble, and he said, "Take a fool's advice and stay away from up there."

J. B. Robinson testified that he was in Dr. Means' drug store right under the defendant's office and heard the shots, and walked out and started up the stairs, and was about two-thirds of the way up when the defendant

said, "'Hold on there; don't come up here.' I said, 'This is Banks Robinson;' and he said, 'All right, Banks.' He was standing in the door with the shotgun and a pistol in his hands. I looked around and saw Mr. Gray laying there, and I said, 'Doctor, how come this?' and he said, 'I cannot tell you; it was done so quick that I do not know how it was done; I never was so sorry over anything in my life as this.' I said, 'Doctor, did you kill him with bird shot?' and he said, 'No, Banks, I killed him with buckshot.' As I said this, he unbreeched the shotgun and put in a couple of shells. He asked me to look over the room, and see if I could find any shells. I looked, and found one, a No. 10, loaded with buckshot."

On behalf of the defendant, Sam Weems and Jim Crawford testified that they heard the deceased remark to some one, "I will go up and see if he will kick me out that way," and a few minutes afterwards they heard the shooting.

Dr. John B. Jones testified: That he officed with Dr. Steward, the defendant; that the deceased, with Jim Story, walked in and said, "You all seem to be having a jubilee up here," and Julian Donaghey said, "No, we are not having a jubilee; but I think a fellow fell down the stairs and cut his hands on a whisky bottle;" and the deceased said, "You need not tell me that is all there was to it, because I know there was something else to it;" and the defendant said, "I do not know that it makes any difference to any one whether there is anything to it; we have to protect our office against any such crowd as that; we are not going to have any drunken crowd around here." That the deceased then advanced forward, and remarked, "'You old son of bitch, what is the matter?' and everything started quicker than you could hardly say." The deceased grabbed the shotgun, and Jim Story grabbed him by the arm, and the gun fell on the floor. Witness grabbed the defendant, and fell on the floor, and the defendant fell over him. That he heard two shots, and as he looked the deceased was holding the shot-

gun in the defendant's face. The deceased dropped the gun and grabbed his stomach, and said, "He has killed me."

Tom Smith testified that the defendant had a commission under him as a deputy sheriff.

The defendant did not testify.

On rebuttal several witnesses testified that the deceased had a good reputation as being a peaceable, law-abiding citizen. It was the theory of the state that the homicide was deliberate and malicious. The defense was justifiable homicide in self-defense. The view we are constrained to take of this case renders it unnecessary to pass upon the questions raised by the assignment of errors, except the one that the verdict is contrary to the evidence. Under the evidence in this case as to whether or not the killing was in necessary self-defense was a question of fact for the jury. The right of the defendant to use sufficient force to eject the deceased from his office did not in itself justify his assault by a deadly weapon. If after remonstrance an invasion of the premises of another presumably for the purpose of assault cannot otherwise be prevented, it may be justifiable homicide to kill the person so forcibly invading. Our Code provides (Comp. Laws 1909, sec. 2290; Rev. Laws sec. 2334,) in so far as applicable, as follows:

"When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is; or, when committed in the lawful defense of such person, * * * when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished."

If a man, though in no apparent danger, kills another through fear, undue alarm, or cowardice, under the belief honestly entertained that great personal injury is about to be inflicted upon him, it cannot be claimed that under such circumstances he would be justified in so doing, because the belief would be an unreasonable one, and not justified by the circumstances in which he was placed. The right of self-defense is

founded on the law of necessity, and can only be exercised when the slayer is acting under a reasonable belief arising from the circumstances of the case, as they appear to him, that his life is in imminent danger, or that he is in danger of great personal injury, from some overt act of his assailant, and that the danger was so urgent and imminent at the time of the killing that it was necessary for him to take life to protect his own. The reasonableness of the defendant's belief must be determined from his standpoint, but it is a question for the jury as to whether he had sufficient grounds upon which to base such belief. And if there is a conflict in the evidence, or different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts. It is no more the province of the appellate court than of the trial court to determine controverted questions of fact arising upon conflicting evidence.

The instructions of the court fully and fairly covered the law of justifiable homicide in self-defense. The court, however, for some reason not apparent from the record, submitted to the jury the issue of manslaughter in the second degree. It must be admitted that the evidence in the case does not show, or tend to show, any of the elements or ingredients of manslaughter in the second degree, even assuming the facts to be as claimed by the defendant, and as shown by the evidence offered on his behalf. Obviously, when the homicide is admitted, and justification in self-defense is relied upon as a defense, there can be no element of manslaughter in the second degree, even where the defendant does not testify as in this case. Our procedure criminal provides that the jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment or information and "when it appears that a defendant has committed a public offense, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degree only." Section 6829 and section 6875, (Rev. Laws, secs 5877 and 5923). The

law makes it, however, the duty of the court in charging the jury, where there is no evidence tending to prove the commission of an offense which is necessarily included in the offense charged, to refuse to instruct on such included offense or lower degree of the offense charged in the indictment or information, and it is the settled rule of decision in this state that it is the duty of the trial court to say in a homicide case, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the second degree. *Cannon v. Territory,* 1 Okla. Cr. 600, 99 Pac. 622. Says Mr. Wharton:

"The province of the court on an issue as to the degree of a homicide is to guide and direct the jury, and keep them within proper bounds. It is its duty to determine whether competent evidence has been introduced, which, if believed by the jury, would furnish the elements or ingredients of any particular grade of homicide." (Wharton on Homicide [3d Ed.] p. 241.)

There seems to be a growing laxity in the observance of the rule which requires trial courts to confine the instructions to the included offenses or lesser degrees which the evidence tends to prove. While this court has not been called upon to construe our singular constitutional provision (article 2, sec 21), "nor shall any person, after having been once acquitted by a jury, be again put in jeopardy of life or liberty for that of which he has been acquitted," trial courts should not be unmindful of the fact that it is a matter of grave doubt whether a defendant after having been acquitted of the higher offense and convicted of an included lower or inferior one may again after having secured a new trial be placed upon trial for the higher offense charged in the indictment or information.

In this case the instructions submitting the issue of manslaughter in the second degree were not excepted to by the defendant, and errors can be made available on appeal only by exceptions duly taken on the trial.

If the jury in mercy or sympathy for the defendant or by mistaken view of the law or the facts finds the defendant

guilty of manslaughter in the second degree, in a case where the law and the facts make the crime murder or manslaughter in the first degree, it is an error in favor of the defendant of which the law will not take cognizance and of which the defendant cannot complain. Where the issue has been submitted, the jury have the undoubted power to fix the crime in the lowest degree when it ought under the law and the evidence to be fixed in a higher degree. We have given a careful consideration to this case, and we do not find that any injustice has been done the defendant.

The judgment of the district court of Pontotoc county is therefore affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.