# HERBERT IRBY v. STATE.

No. A-3019—Opinion Filed Sept. 29, 1920.

Rehearing Denied May 10. 1921.

(Syllabus.)

(197 Pac. 526.)

1. **HOMICIDE—Murder—Conviction of Manslaughter—Right to Complain.** In a prosecution for murder, when the court submits ·the issue, and the jury finds the defendant guilty of manslaughter in the first degree, in a case where the law and the facts make the crime murder, it is an error in the defendant's favor, of which he has no cause to complain.

2. **EVIDENCE—Experiments Made out of Court.** Evidence of experiments made out of court, and not in the presence of the jury, is admissible upon the same principle that the experiments themselves may be conducted in the jury's presence.

3. **SAME—Similarity of Circumstances for Court.** Where the competency of evidence of experiments depends upon similarity of circumstances and conditions, the question is one for the court to determine.

4. **SAME—Circumstances Approximately Similar.** If the evidence shows that the experiments were made under circumstances approximately similar to those which surrounded the original transaction, and such experiments would serve to shed any light upon that transaction, it would be· admissible, although such experiments might not have been made under exactly similar conditions as attended the original transaction. The results of such experiments are not conclusive, but are mere circumstances to be considered with the other evidence in the case, and are to be weighed and determined by the jury.

5. **APPEAL AND ERROR—Discretion of Trial Court—Permitting Articles to be Taken to Jury Room.** Where the jury in open court request permission to take with them to the jury room, to inspect during their deliberations, articles introduced in evidence, the granting or the refusal of the request is in the discretion of the trial court, the exercise of which will not be reviewed on appeal without an affirmative showing that the discretion was abused.

*Appeal from District Court, Tillman County;*
*Frank Mathews, Judge.*

Herbert Irby was convicted of manslaughter in the first degree, and appeals.    Affirmed.

The information in this case charged that in Tillman county, on or about the 11th day of July, 1916, the defendant, Herbert Irby, did kill and murder Ruby Irby, his wife, by shooting her with a pistol.

The evidence shows that the defendant and the deceased were married at Ardmore on the 23d day of May, 1916. The next day they returned to the home of her father, Rev. L. P. Morris, who was living at Cornish.    After staying there a little more than a week, the defendant left, saying that he was going to Ardmore.    Three days later he wrote a letter to his wife, saying, in effect, that he had deserted her.    In about a week he returned to the home of his wife's parents.    After staying there about three weeks, the couple left on a Sunday morning in June in a covered wagon drawn by a team of mules, the property of the father of deceased.    They drove to Grandfield, Tillman county, and were there about three weeks at the time Mrs. Irby was shot.    A substantial statement of the evidence is as follows:

City Marshal Sadler, of Grandfield, testified:

"I was called to the home of Mr. Hilliard between 8 and 9 o'clock the evening of the 11th day of July, this year. I found Mrs. Herbert Irby lying on the ground, with her feet towards the wagon between the two wheels.    The wagon was fronting north, and stood in the yard a little north and west of the Hilliard house.    It was 67 feet from the door of the house to the wagon.    I picked up a pistol about 3 feet north of her, and 2 or 3 feet from her right hand.

It had an empty shell in it, and the other chambers were empty. She died in a few minutes; I arrested Herbert Irby. He said he wanted to go to the telephone station to talk to some one at Ringling. When they answered he said, 'Is that you, John? They have me under arrest.' We went back to Hilliard's. He said, 'She came out there and stepped on the brake beam and reached down by my side and got the gun from under a quilt and stepped down off the brake and squatted down on the ground and shot herself.' That is about his words. He didn't seem to be excited at the time. I examined the body of the deceased, and found she was shot on the right side of the head, the skin was broken under her eye, and she had a bruise above the hip."

Dr. F. Rosenberger testified:

"I am a practicing physician at Grandfield. I examined Mrs. Ruby Irby, and found her suffering from a gunshot wound in the head. The point of entrance was about an inch above the ear. Her heart was beating faintly, and she died in a few minutes. The apparent course of the bullet was upward and backward. There was no powder burns anywhere upon her face. There was a slight discoloration about the eye, and a slight abrasion below the eye."

Dr. Chapman testified:

"I am a practicing physician at Grandfield, I arrived at the scene after Dr. Rosenberger. She was still breathing. We picked her up and carried her into Mr. Hilliard's house. She was dead when we reached the house. The wound was about an inch above the right ear. The bullet ranged upward and backward. There was a bruise near the right eye."

Rev. L. P. Morris testified:

"Ruby Irby, the deceased, was my daughter. She was 17 in January, and was married to the defendant the 23d

day of May. The next day they came to my house and stayed there a little over a week, and the defendant left, saying that he was going to hunt some work; three days later she received a letter from him. The letter is identified and offered, it s n part as follows:

" 'June 7—16.

" 'Dearest Wife:

" 'Will try in my poor humble way to tell you how I feel this morning. Ruby I have done you wrong—and God knows I am sorry—but I dont believe you really love and trust me as you should. And, I have just awakened out of a dream, a dream that causes me great pain—but I truly believe we will both be better off, if we never see each other again.

" 'I know now that I do not love you as I should and I believe there is another you love more than you do me. And for these reasons I am not going to come back or let you come to me. You can get a divorce in one year, on the grounds of desertion and then you will be free to do as you please. * * * Now sweetheart for my sake please do not take it hard. I have been told by several people that you loved another so I am doing this for your own sake, as well as for mine. I thought I loved you when I married you but now I know that I dont. I could easily learn to love you but knowing that you have loved others before you met me, I had rather we part.

" 'Now dont think that I have found some one else whom I love for I haven't. I dont know if I ever will love anyone. I dont know what true love is. And I dont care if I never know and Ruby if our little Herbert is on the road go to Johnie and he will give you medicine to knock it. I know you dont want to have him now, and neither do I, so now just as quick as you find out go and get the medicine or else get your mother to help you. Ruby if there is any thing you want me to know tell my mother and she can get word to me some way—if you get

sick and need some money tell her and I will send it, but if you dont want any of these, please do not worry her for her heart is near enough broke with our trouble so now I will close leaving it up to God to judge me and take care of us both and forgive me if I am not doing right I will say Good bye                           Yours

" 'Herbert.

" 'P. S.   Ruby if you want to you can go on and use your own name for I do not ask you to keep mine.'

"Something like a week after she received the letter he came back. They stayed there until about three weeks before her death.   They left on a Sunday morning; I don't remember what day of the month, but it was in June.   I let them have a wagon and a team of mules, and they were going to the harvest field in Tillman county.   1 am a minister, and at that time I was living at Cornish.   I was at Grandfield the next morning after the tragedy, and was present when three cartridges were found on the ground under the wagon brake."

Mrs. O. L. Hilliard testified:

"I live with my husband and four children in Grandfield.   I met the defendant and his wife about three weeks before her death.   He was working in the harvest fields and they were camping out.   A few days later they came to my home.   She stayed with me most of the time, except at nights.   The defendant was out in the harvest fields when he was not at my house.   The wagon was about 40 or 50 feet north and west of the house; the defendant went out that day, and came back about 1 o'clock, and said one of his mules was sick, and he had decided to go home.   He ate his dinner and went to the Davis lumber yard. He came back, and asked his wife to get his gun, and she gave it to him, and he went over to the lumber yard.   When he came back the gun was put in my dresser drawer.   He asked his wife for some money, and she told him that she had given it to her little brother.   He said, 'Your brother don't

need it; when you need any money I can get it.' I noticed that he was angry. She wanted to get some peaches, and suggested that we go over to Mr. Carley. They had an orchard. While she was gone the defendant came in and asked me if Ruby had given me $2. I told him 'No,' and he said she told him that she had given me $2, and he said, 'Mrs. Hilliard, you don't know the trouble I have had; you don't know what I have had to contend with.' She came back directly in a jolly good humor. I asked her if she told Herbert she had given me $2, and she said, 'No; I didn't tell him anything of the kind.' She asked him for some money to pay for the peaches, and he gave her a dime. I was in the kitchen, and she came back and said, 'We will let the peaches go.' Later we went over to Mr. Rosenberger to get some peaches, and while we were there she said, Mrs. Hilliard, please do not tell Herbert that you had to pay for these peaches; I will get the money some time, and send it to you after I get home.' After we came back from Mrs. Rosenberger we went to the wagon. The defendant was sitting on the ground. She walked up to him and said, 'Sweetheart, I know where we can get some peaches.' He said, 'Well, you will have to go and get them.' She said, 'No; you will have to go with me, because they might think I am stealing them.' We went to the house, and I asked her why she didn't stay and let him go home with the wagon. She said, 'If I did, I would never see him any more. Mrs. Hilliard, you don't know how I have suffered; I am afraid Herbert is going to kill me.' I said, 'I would not think that.' She said she was going home to her father's the next day with Herbert in the wagon. After her conversation with her husband that evening she went out upon the sidewalk crying, and I followed her a little ways and asked her what was the matter. She didn't answer me she walked off up the sidewalk, and I went back in the house. The defendant came in and asked me where Ruby was, or where she went, and I told him I didn't know. He said, 'I believe she has gone to telephone her people.' He sat there a little while and said, 'If I have to go after her she will wish she hadn't gone.' It was just getting

dark. She was gone about 40 minutes when she came back. She was still crying. We went into the kitchen, and she laid her hand on my shoulder and said, 'Mrs. Hilliard, Herbert is going to kill me; maybe it is for the best; I don't know what to do.' She walked out the kitchen door towards the wagon. I stepped back, and then looked out again. She was standing on the wagon. I saw a flash of a revolver, and I saw her throw her hands up like this and fall backward. I ran and called for help. The flash was from the side of the wagon; I would say that the flash was about 2 feet long. My little boy was out there in the yard."

Joe Hilliard testified:

"I am 11 years old. I was out there by the well with my little brother and the dog. I saw Mrs. Irby when she passed by. She came out of the house by the back door and went to the wagon. She got up on the wagon brake. Herbert Irby was in the wagon when the shot was fired. I saw Herbert Irby jump out of the wagon and pick up his wife. When she was standing upon the brake it looked to me like her hands were on the side of the wagon bed. When she fell backward she threw them up. I saw Herbert Irby fling something down aside of him when he got out of the wagon. I asked him if he wanted me to go for a doctor, and he said, 'Yes.' ".

O. F. Hilliard testified:

"I knew the defendant and his wife about three weeks. During that time I went with him to town to get some groceries; and she went to the picture show. He said he wished he had his gun; that he was going to get shet of her. He told me a time or two in the harvest field that he was going to get shet of her. Mrs. Irby stayed with my wife while we were working in the harvest. I did not see him have the gun in the harvest field but once, but I saw

him have it in the house several times while he was staying there."

E. M. Linsey testified:

"I am in the grocery business at Grandfield; I closed the store that evening, and was going home in my car, and I saw Mrs. Irby lying on the side of the road. My son was driving the car. He stopped, and I got out and asked her if she was sick. She didn't answer. I spoke to her a time or two, and went over near her. She jumped up and threw up her hands, and said, 'Is he gone?' or something like that, and started off. That was one block north and one block west of the Hilliard home. We started back and met Mr. Irby, her husband. He asked me if I had seen a young woman around there anywhere. I told him I did, and I asked him who she was, and what she was doing out there that time of the night. He said her name was Irby, and she had spells like that. I went back with him to where I had seen the woman, and she was gone."

J. D. Beavers testified:

"I live one block south and one east of the Hilliards. I saw the defendant in front of Mr. Hilliard's door that evening. I saw a car stop nearly a block from my house. Me and my wife's sister were sitting in front of my house. We saw a man get out of the car. Shortly afterwards I heard a woman crying. Mr. Bosworth was over at his house, and said, 'John, did you hear that?' I said, 'Yes.' We saw a woman going down the road crying, and followed her a little ways, and she went down to Mrs. Hilliard's house. We met the defendant, and told him that we saw a woman going down the road crying. He did not say anything."

A. B. Corley testified:

"I am in the livery business at Grandfield. I live one block east, across the street from Hilliard's. I heard a pistol shot, and I heard Mrs. Hilliard screaming, and I

ran over there and met Mr. Hilton, and we went to the wagon. Mrs. Irby was lying on the east side of the wagon, her feet below the brake beam and her head just a little to north of east. The defendant seemed cool and calm, and seemed to me to be indifferent; he was rolling and smoking cigarettes. The next morning I picked up three cartridges about 2 feet north of where the blood was. Two were right together, and the other six inches from these two. Mr. Morris, father of Mrs. Irby, was there when I picked up the cartridges."

E. S. Bostic testified:

"I was a deputy sheriff. Mr. Sadler took charge of the defendant, and later delivered him to me. I asked him if he wanted to go and see his wife, and he said he didn't give a damn whether he ever saw any of her folks or her either."

Ira A. Sessions testified:

"I am in the furniture and undertaking business at Grandfield. I made an examination of Mrs. Irby's face. and found that the bullet entered right above the ear and broke the skin on the other side of her head. The hair was not singed or powder-burnt, and her face was clear of powder burns."

F. G. Rosenbaum testified:

"I live a little more than a block from where the shooting occurred. I heard a pistol shot, and I heard a woman scream. I started that way with Mr. Gibbs. We found this woman lying on the ground, and her husband standing close by. I asked him what was the matter, and he said, 'she shot herself.'"

J. W. Hubbard testified:

"I am in the hardware business at Grandfield, and I have had experience in using firearms. I was present, with four or five others, and we made experiments with this pistol."

Over the objections of the defendant he further testified:

"We shot the pistol several times. The cartridges used were the same kind, but of a different brand. We tried it on some tissue paper. We placed some hair on the paper and shot the pistol at it at about 2 feet, and it showed considerable powder burns, and at 3 feet it showed considerable powder burns."

F. H. Hurst, over the objections of the defendant, testified:

"I first held the pistol about 10 inches from the ground, and shot it straight down through some hair on tissue paper. The force of the explosion blew a great deal of the hair away, and singed it more or less. I then shot the gun 2 feet from a paper napkin against a bank of dirt. The napkin was considerable powder-burnt. Then 3 feet from the napkin, and it was powder-burnt. Then four feet, and there were some signs of powder-burns. I shot 7 feet at a piece of cloth, and that showed a little powder burn, and I shot at 10 feet, and there were very small specks of powder, if any, at that distance."

William Williams testified:

"I was present when the experiments were made. At 2 feet the powder passed clear through the napkin, and at 3 feet the powder showed on the paper."

For the defense, Reed Davis testified:

"I am in the lumber business at Grandfield. The defendant was at my lumber yard that afternoon, doctoring a sick mule. There was a stranger there who had been on a drunk, and he took slight offense at the defendant in some way, and took out his pocketknife and started towards the defendant, and the defendant got up and moved away. That is about all I noticed. The defendant and his wife stayed at my house a short time. The first night they

had a little quarrel about going to the show. The next day the defendant went out threshing, ana she went to Mr. Hilliard's."

A. C. Starkey testified:

"I was the second man that arrived there. I looked at the wagon. There was a bed in the back end of the wagon. The wagon sheet was raised up on the east side about a foot and a half; it was lower on the other side and tied."

J. B. Hutchinson, chief of police at Ardmore, and F. C. Ingham, of Ringling, qualified as character witnesses, and testified that the general reputation of the defendant for being a peaceable, law-abiding citizen in the community in which he lived was good.

J. P. Irby testified:

"1 am the father of the defendant. I was with my son when he was in the custody of Mr. Bostic. I didn't hear Mr. Bostic ask him if he desired to see his wife, and my son did not say, 'No; I don't want to see her or any of the damn family.' "

As a witness in his own behalf the defendant testified:

"I am 19 years old. I was raised in and around Ardmore; I was married at Ardmore on the 23d day of May, 1916. The next day we went to her father's house. I stayed there about two weeks and went to Ardmore. I wrote the letter introduced in evidence. Then I wrote her another letter, and told her that I did not mean what I wrote before. I told her to meet me in Madill. She came, and we stayed there that night, went to Ardmore the next day and from there to Ringling, and from there to her father's house, and stayed there about three weeks, then came to Grandfield in a covered wagon. I had two chairs in the front end, and the bed was on the back end of the wagon. I came back that day with one of my mules sick. I asked my wife if

she had any money. She said, 'Yes.' I told her that I would have to have some to buy feed for the mules; she said it was not necessary. I led the sick mules over to Mr. Davis', and we doctored the mules for about 30 minutes. There was a bootlegger in there that I had a few words with on Monday. He made a break at me with his knife, and I jumped away, so I decided to go and get my gun from my wife. I told her what I wanted with it. She laughed, and asked me to take it and arrest him. I went back to the lumber yard and stayed over an hour. I returned to the house about 4:30, and told my wife I would lay down and take a nap, and she fanned me a little, I asked my wife about the money again. She flushed up, and seemed to get mad, and I said, 'Ruby, don't get mad, for you are not in a condition to get mad.' She left the house then. I asked Mrs. Hilliard if my wife had given her $2, and she said, 'No.' My wife had told me that she had given her $2. After supper I returned to the house again. I said, 'Mrs. Hilliard, I don't care about the money, but I wish you would tell me the straight about it.' My wife got mad, and walked out the front door. I walked out to the wagon and put my gun under the quilt. I went in and asked Mrs. Hilliard, 'Where has she gone?' She said, 'We don't know.' I said, 'I expect she has gone over to telephone her father.' I sat in the doorway, and then I got up and went in the direction that Mrs. Hilliard's boy said my wife went. I didn't meet any one the first trip. I went again, and met an old gentleman and a young man, and I asked them if they had seen a young lady up there. They said, 'Yes,' and we went to the corner. One of the men said he found her on the ground; that she got up and staggered off south from there. I returned to the house. She was there lying on the bed. I went out to the wagon and doctored the mule a little. I thought I would return to my wife and make up. I returned and sat down on the back door step 5 or 10 minutes. Then I went back to the wagon and decided that I would lay down up there the rest of the night. My head was towards the south. I saw my wife and Mrs. Hilliard going to get a bucket of water. The next time I saw my wife

she was up on the brake beam of the wagon. I thought
I would wait until she spoke. She reached over with her left
hand, her right hand on the bed, and she reached down and
got the pistol and raised it up and broke it. I saw her pull
some shells out, and I turned my head to look at the mules
and then I heard the report of a gun; I jumped out of the
wagon and got my wife up in my arms."

"By a Juror: That gun being covered up and it be-
ing dark in the wagon, where or how did your wife find
that gun? A. Well, it was not dark. It was moonlight.
Mr. Saddler came. I told him how it occurred. We went
to the telephone office, and I talked to my brother at Ring-
ling and told him that Ruby had shot herself, and that I
was arrested. I didn't make the statement to Mr. Hilliard
that if I had a pistol I would kill somebody; I walked to
the grocery store with Mr. Hilliard, and I saw her and
a young man coming up the street. They never looked at
me, and I walked on in and said to Mr. Hilliard, 'That is a
pretty nice joke.' I never at any time or place stated to
Mr. Hilliard that I intended to make away with my wife,
and I did not make the statement that Mr. Bostic testified
I made. I loved my wife, and I don't believe that there
ever was a man in the world who loved or thought any more
of his wife than I did of mine."

*Mounts & Davis,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* and *W. C.
Hall,* Asst. Attys. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). This
appeal is from a judgment of conviction for manslaughter
in the first degree, the punishment having been assessed at
imprisonment in the penitentiary for a term of four years.
The information charged the defendant, Herbert Irby, of
having committed the crime of murder by killing his wife,
Ruby Irby, by shooting her with a pistol. The theory of
the prosecution appears to have been that the killing was

an assassination. The defendant sought an acquittal of the charge against him on the ground that he had no connection whatever with the shooting, and as a witness in his own behalf testified that his wife shot herself. One of the grounds for a new trial and assigned as error and now urged for a reversal of the judgment is that the evidence was insufficient to establish his guilt, and this insistence called for the foregoing extended synopsis of the testimony. It is obvious that upon the evidence it was a question for the jury to determine as to whether or not the defendant shot Ruby Irby, or whether the fatal shot was self-inflicted. Carefully considering the whole testimony in the case, we feel constrained to say that we have seldom read a record of conviction where there was less palliating circumstances in behalf of the defendant than this case presents. On the contrary, the defendant's conduct from the beginning to the end shows "a heart regardless of social duty and fatally bent on mischief."

The evidence on the part of the state discloses that the defendant deliberately shot and killed his wife, and the physical facts show that the denial of the defendant is wholly incredible. However, it was for the jury to judge of the weight of the evidence and the credibility of the witnesses.

The next assignment is based on exceptions reserved to the admission of evidence of experiments made in regard to the effect of powder fired from the pistol which killed the deceased upon a napkin and upon tissue paper at distances ranging from 3 to 10 feet. The undisputed evidence was that there was no powder burns on the head or neck near where the bullet entered, and this evidence was admitted as tending to show the distance of the pistol

from the deceased's head when the fatal shot was fired.

In Ruling Case Law, vol. 10, § 189, it is said:

"Evidence of experiments made out of court, and not in the presence of the jury, is admissible upon the same principle that the experiments themselves may be conducted in the jury's presence. * * * An expert in gunshot wounds who has conducted a series of experiments with pistols of the same caliber as that with which a homicide was committed, as well as of the pistol in question, as to the nature and effect of wounds inflicted thereby and of the manner in which they are produced, may be permitted to testify as to the result of such experiments, nor is his testimony to be excluded as ex parte and manufactured evidence."

As a general rule an experiment introduced for the purpose of proving that the alleged result is obtained by a certain act or operation, considered as existing in the case, should not be permitted unless the conditions and circumstances under which the experiment is made are similar to those shown actually to have existed in the case. However, if the evidence shows that the experiment was made under circumstances similar, or approximately similar, to those which surrounded the original transaction, and such experiment would serve to shed any light upon that transaction, it would be admissible, although such experiment might not have been made under exactly similar conditions as attended the original transaction. The want of exact similarity would not exclude, but would go to its weight with the jury. 1 Michie on Homicide, p. 832, and cases cited. Where the competency of evidence of experiments depends upon similarity of circumstances and conditions, the question is one for the court to determine. We are satisfied that the court did not err in admitting evidence of the experiments as tending to shed some light on the

firing of the fatal shot, and its weight was for the jury to determine.

The next assignment is that the court erred in permitting the jury to take with them to their room certain exhibits. IThe record shows that on request of the jury the court permitted them to take the cap, letter, and revolver. We have decided this question adversely to the defendant's contention in the case of *Hopkins v. State,* 9 Okla. Cr. 104, 130 Pac. 1101, Ann. Cas. 1915B, 736, wherein it is held:

"Where the jury in open court request permission to take with them to the jury room, to inspect during their deliberations, articles introduced in evidence, the granting or refusal of the request is within the discretion of the trial court, the exercise of which will not be reviewed on appeal without an affirmative showing that the discretion was abused."

The only remaining assignment is, "Error of the court in submitting to the jury the question of manslaughter." The record shows that the defendant reserved exceptions to the instructions submitting the issue of manslaughter in the first degree. It is contended that under the evidence the defendant should either have been convicted of murder or acquitted, and that no instructions for manslaughter in the first degree should have been given. In support of this contention we are cited by counsel for defendant to *Leseney v. State,* 15 Okla. Cr. 217, 163 Pac. 956, in which it was held reversible error to instruct on manslaughter in the first degree when the evidence tended to show that the defendant was guilty of murder alone, and there was no evidence to support the charge of manslaughter in the first degree. In all other cases it has been uniformly held by this court that, even if the evidence did not warrant an instruction for manslaughter, it is an error in the defend-

ant's favor of which he has no cause to complain. Under the provisions of the Code of Criminal Procedure—

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." Section 5923, Rev. Laws.

In the case of *Lytton v. State,* 12 Okla. Cr. 204, 153 Pac. 620, it is said:

"It is sufficient answer to the contentions made to say that we think after a careful survey of the facts in evidence, that there was no element of self-defense in this case. Considering the testimony of all the witnesses in the case excepting that of the defendant, there is no doubt in our minds that the homicide was a deliberate and premeditated murder; and, while the defendant's account of the killing differs somewhat from that given by the other witnesses, he is, we think, guilty of murder upon his own statement. It would seem that the demands of justice and the protection of society clearly required in this case that the penalty prescribed by the law for the punishment of the crime of murder should have been imposed upon the defendant. However, the court submitted the question of manslaughter in the first degree, and the jury found the defendant guilty of this lower degree. It is the province of the jury, if the defendant is found guilty, to determine and fix the degree by their verdict, and it has been uniformly held by this court that if the jury in a homicide case find the defendant guilty of a lower degree, where the law and the facts make it murder, it is an error in favor of the defendant of which he cannot complain." *Cannon v. Territory.* 1 Okla. Cr. 600, 99 Pac. 622; *Reed v. State,* 2 Okla. Cr. 589, 103 Pac. 1042; *Atchison v. State,* 3 Okla. Cr. 295, 105 Pac. 387; *Warren v. State,* 6 Okla. Cr. 1, 115 Pac. 812. 34 L. R. A. (N. S.) 1121; *Kent v. State,* 8 Okla. Cr. 188. 126 Pac. 1040; *Jones v. State,* 8 Okla. Cr. 576, 129 Pac. 446; *Steward v. State,* 9 Okla. Cr. 327, 131 Pac. 725; *Moutry v. State,* 9 Okla.

Cr. 623, 132 Pac. 915; *Robinson v. State,* 15 Okla. Cr. 456, 177 Pac. 925.

From a full consideration of all the evidence we are convinced that the jury would have been fully justified in convicting the defendant of murder, and he has cause to congratulate himself that the jury found him guilty of manslaughter in the first degree only, and assessing the minimum punishment. However, upon the record our duty is performed by an affirmance of the judgment. The judgment of the district court of Tillman county is therefore affirmed.

ARMSTRONG and MATSON, JJ., concur.