## WARREN BURTT v. STATE.

No. A-9326. March 11, 1938.
(77 P. 2d 580.)

Jean R. Reed, of Wagoner, for plaintiff in error.

70

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and E. G. Carroll, Co. Atty., of Stilwell, for the State.

BAREFOOT, J.  The defendant was charged by information in Adair county with the crime of rape by force, was tried and convicted, and sentenced to serve a term of eight years in the penitentiary, and has appealed.

Defendant, in his brief, sets forth ten assignments of error, but groups them under one heading, contending that:

"Under the laws of this state, when the state in a prosecution of rape relies on the theory of rape by force and fear as in this case, it is essential to conviction that the state show by competent evidence that the utmost force was used and threats made of immediate bodily harm, coupled with apparent power of execution to the prosecutrix. In the case before your honors it was never shown by the state that the prosecutrix was ravished by force and fear or that the defendant made any threats of whatsoever nature toward the prosecutrix."

It becomes necessary to review the evidence offered in this case. It reveals that the prosecutrix, Melodees Stilwell, and a young girl friend, Beatrice Barker, both of whom resided in Stilwell, Adair county, in company with a crowd of young people, went to a picnic at the town of Caney on the night of July 4, 1936, on a truck belonging to Monk Paden. They remained at the picnic grounds until about 10:30, and went from there to another picnic at Barron Forks. While at Barron Forks they saw Mr. and Mrs. Ralph Hill, Mrs. Hill being a sister of Beatrice Barker. Both of these witnesses testified to seeing both of the girls at the picnic about 10:30, and that they were at that time in the company of the defendant and Bill Stevens. He testified that he told them who the girls were and that they were just "kids," and that if they would be good to them he would let them take the girls home as they had requested, otherwise he would take them home himself; that defendant told him they would. The defendant and Bill Stevens were driving

a truck which belonged to, and was being operated by, the defendant. Just before leaving the girls, Mr. and Mrs. Hill saw the defendant and Bill Stevens and Melodees Stilwell and Beatrice Barker leave in the truck headed toward the town of Westville. They saw them returning in a few minutes going in the opposite direction. Mr. and Mrs. Hill did not see the girls again until the next morning, when they saw them in the town of Stilwell, their clothes were torn, their eyes were black, and their faces and necks were bruised, and they were beaten up.

Beatrice Barker, a witness for the state, testified to going to the picnic on the truck with prosecutrix, Melodees Stilwell. While there they saw the defendant, whom she knew when she saw him, and Bill Stevens, whom she also knew; that the four of them went in the defendant's truck to the Barron Fork picnic; that while there they met Mr. and Mrs. Hill, Mrs. Hill being the sister of the witness; that they left the picnic grounds at Barron Fork in defendant's truck and him driving; that they went around through Arkansas, but did not go through the town of Westville; but turned at the road at the port of entry and came through Evansville, Ark., and back to Stilwell. Defendant was driving, and on the way back he stopped on the side of the road. Melodees asked him why he stopped and he said: "I will show you," and he pulled her out of the truck. That Bill Stevens told her to get out and she did not. That she was sitting on Bill Stevens' lap and he pushed her out of the door. Witness said that they got to scuffling and were screaming and hollering. That there was a house close by and Melodees said something about it. That they told the girls to get back in the truck and they would take them home. They all got in the truck and went down the road a little further, when defendant stopped the truck again. After some argument about getting out of the truck, defendant got out and pulled Melodees Stilwell out of the truck, then Bill Stevens started pulling witness out of the truck. After fighting and hollering and trying to keep them away

from her, she testified that prosecutrix was scuffling and hollering and was trying to get away from defendant and trying to get back in the truck. That they finally got loose and went up the road, and the boys caught up with them and jumped out and caught them and dragged them into the truck. Witness testified she fainted, and when she came to Bill Stevens had pulled her into the ditch on the right side of the road, and that Melodees was fighting, crying, and screaming. Then witness related that she was overcome and fainted. That after she was overcome Bill Stevens had dragged her into the ditch. That he accomplished an act of sexual intercourse with her. Finally she got up and they got back to the truck. That he held her and made her go to the truck, and that they went back to Stilwell in the truck. That as she got back to the truck prosecutrix and defendant were coming from the other side of the road and he was holding her and making her walk along, and she heard Melodees say: "Why don't you let me loose, you've done enough already." She said she told them: "Let us loose and we will walk on back," and they said, "No, you won't." Witness stated that they got in the truck and went to Stilwell and were let out down where the railroad crosses the road by the Holiness church. Witness stated: "When we got out we went over to her house," and defendant asked prosecutrix if she was going to have him arrested and she said, "Yes," and he said, "I don't guess you will, you are going with me." Just as soon as they got in the house they reported to the folks what had happened to them. She testified to examining their clothing and found that prosecutrix' clothing were torn, dirty, and had blood on them.

Melodees Stilwell, the prosecutrix, as a witness for the state, testified that she was 17 years of age on the 22d day of November, 1935. She corroborated in detail the evidence of Beatrice Barker with reference to going to the picnic on July 4, 1936, and being in company with defendant and Bill Stevens. She said when defendant stopped the truck she asked him what was the big idea and he just laughed

and told her to get out. He kept trying to get her to get out of the truck, but she told him she was not going to get out. He said she was and pulled her out. That she fought and screamed. That she heard Beatrice Barker scream and heard her say: "Oh, I feel like I am going to faint." That defendant dragged her off to the side of the road and threw her down. When he threw her down, she reached out and got a big rock and hit him on the forehead, and that defendant took the rock away from her and finally, after overcoming her, had sexual intercourse with her. She testified that all the time she was hollering, screaming, and fighting with her fists and the rock which she had. She had bruised places on her shoulder, and her lips were bleeding, and her dress was torn and bloody. After accomplishing the act of intercourse, "he turned me loose and then grabbed me and drug me to the truck and told me to get in." "I did not want to. He picked me up and put me in the truck." She testified that it was not daylight, but was about 4:30 a. m. when she arrived at her home. She went into the house and immediately told her mother what had happened and asked her to get Mr. Nicholson, the sheriff, who lived across the street north of them. Mr. Nicholson was not at home, but Mrs. Nicholson, his wife, came over. Dr. Church came over and gave them some medicine.

Fannie Hughes, the mother of Beatrice Barker, testified as to her going to the picnic and of seeing her about 4 a. m. on the morning of the 5th of July at the Stilwell home; that she was beaten and bruised on her legs and body; that prosecutrix had her face scratched up and had blood on her nose; that her dress and her underwear were torn.

Mr. and Mrs. Charlie Stilwell, the mother and father of prosecutrix, both testified to the girl's returning home at 4 o'clock in the morning and immediately asking the mother to call the sheriff; that she told them what had happened; that their daughter was bleeding on the face

and had a knot under her ear, and that she thought one of her arms was broken; that she was black and blue all over; that her dress and underclothing were torn and bloody.

Several other witnesses testified to seeing prosecutrix at her home on the morning of the 5th of July, and that she was bruised on her face and body.

The officers who arrested defendant on the morning of the 5th of July testified that his face was bruised and looked as though he had been hit with some blunt instrument.

Numerous witnesses testified that they lived near the road where the evidence showed the truck had passed on the night of the 4th of July, and that during the night, and at about the time testified to by prosecutrix and Beatrice Barker, that they were awakened by loud hollering and screaming of some woman who seemed to be in distress; that they got up and went to the door and plainly heard the hollering and screaming and heard the voices of both men and women; that they did not go to the place, for the reason that they thought it was some one on the road drunk.

The defendant testified in his own behalf. The statement of his testimony given in the brief of the state reveals his testimony in a fair and impartial manner. He testified that he lived in Wagoner, Okla., that he was 24 years old and lived at Wagoner for 15 or 16 years; that on the 4th of July he was in Adair county hauling hay, grain, anything he could get to sell; that he came there to bring a load of hay; that after he unloaded his hay he came back by the port of entry and drove up to town for a few minutes, stopped there because he traded some there, and met Bill Stevens. He knew Bill, and they had stayed together and had been friends, and after a while Beatrice Barker and some other girls he didn't know came to where he was; he stated that Beatrice asked him to take her and the girls to

the picnic and he told her he was going out that way in a few minutes because he was on his way home to Wagoner. Two boys came down there. Bill came back and the five of them went in the truck to the picnic, two girls in the seat with this defendant and Bill, and the two boys were riding behind. Defendant thought it was around 9 o'clock, and, after staying around the picnic awhile, Bill Stevens brought Melodees Stilwell back up to the truck and they stayed there 30 or 40 minutes, and Bill Stevens got in the truck and sat down for awhile. The girls were back on the picnic ground. They came back and wanted to know if the defendant was going to the Barron picnic. He advised them that he was going back to Evansville after awhile. He went back by Westville. He didn't intend to go that way. The girls got in the truck, the two of them, Beatrice Barker and Melodees Stilwell. Bill Stevens got in the truck in the seat by the defendant. The four of them were in the front seat. They went to the Barron picnic. Bill Stevens had some whisky. The girls were riding on the laps of the boys— Beatrice Barker on Bill's lap. They drank some whisky, the four of them. Bill and his girl got out and went off down the side of the road and this defendant and Melodees got on the other side of the car. They walked off down the road a ways and he had intercourse with his girl and he and Melodees came back to the truck. Bill hadn't come back yet, and he blew the horn a few times, and directly Bill and his girl came and got in the truck and they all went back to Barron. They went back to the picnic ground and he judged it was around 11:30. They didn't stay there but a few minutes and went to Westville, through the port of entry (the port of entry is 2 miles east of Westville). They got to the port of entry about 1 o'clock. They went from there to Lincoln, Ark., to get some whisky. They bought a pint of whisky and a pint of orange gin and were all drinking; the girls drank also. They left Lincoln, Ark., around 2 or 2:30 and came back and went on toward Stilwell and turned this side of Stilwell, and when they turned and

stopped about three miles out of Evansville they came around a big sweeping curve where the road makes a curve around a schoolhouse. They stopped and got out of the truck and went off in the sticks. Bill and his girl went west up the road and this defendant and his girl went east. In answer to being asked, "What did you do?" defendant answered, "What most young people do when they go out." After that they got in the truck and started toward Stilwell and stayed on the road. A little pig ran across the road and they threw on the brakes to keep from running over it and it caused Melodees to get her nose mashed a little and Beatrice to get her eye blacked. That was all. He stated that there wasn't any screaming. They arrived in town around 2:30 or 3 o'clock. They let the girls out and started home—Bill Stevens was with him. They didn't stop any more. The next morning he was on the north side of the Severs Hotel at Muskogee, about 6:30, and he got knocked in the head at Muskogee, he didn't know who it was and he didn't know where Bill Stevens went. He didn't know who hit him. He didn't see Bill Stevens any more after this defendant was hit and robbed. When he awakened, he went to Wagoner, Okla., and found out the first thing when he awakened that he had been robbed. He went to Westville and figured Bill Stevens was there and had gotten his money. He figured he would get it back. He had a load of hay and Doc Clarkson was with him and he met Grover Alberty and C. J. Atchley—"That is, they overtaken me." Then he related positively that Melodees Stilwell gave her consent to these two acts of intercourse. He further stated that he never, at any time, used any violence; that she was perfectly willing. He then related on cross-examination that he was a married man and had been married four years and had one child, 9 months old; that he came to Stilwell on the 4th of July in the afternoon, late. He unloaded his hay about sundown. He didn't know whether he got to Stilwell at 10 o'clock or 2 o'clock, but he was not drinking.

On rebuttal the state offered three witnesses, Ira Fields, Jewell Fullerton, and Mrs. Tom Paden, all of whom testified that they knew Melodees Stilwell and Beatrice Barker, and that they went to the Caney picnic on the 4th of July on a truck driven by Monk Paden, and that neither Warren Burtt nor Bill Stevens was on the truck.

The state also offered seven witnesses who testified that they saw prosecutrix, Melodees Stilwell, on the morning of the 5th of July and were in close touch with her and that they did not detect any liquor upon her breath. Two of these witnesses were the mothers of prosecutrix and Beatrice Barker. The defendant offered several witnesses who testified she had the appearance of having been drinking. Several witnesses also testified that they had on different occasions seen prosecutrix in company with certain parties, and had seen them hugging and kissing her. One of these was a former sweetheart who had married. None testified to improper relations. Other testimony was offered which is not necessary to give in the consideration of this case.

The information filed in this case charged the defendant with "unlawfully, wrongfully, intentionally, and feloniously, and by force and putting in fear, rape, ravish, and carnally know one Melodees Stilwell, and have sexual intercourse with the said Melodees Stilwelll, and the said Melodees Stilwell, being then and there not the wife of the said Warren Burtt, contrary to the form of the statute," etc. No motion or demurrer was filed attacking the sufficiency of the information. The information charged the defendant with an offense of rape in the first degree. The court, in charging the jury, instructed them that if they found and believed from the evidence beyond a reasonable doubt that the defendant was over 18 years of age, and that prosecutrix was over the age of 16 years and under the age of 18 years and of previous chaste and virtuous character, and that she was not the wife of defendant, that they should

find defendant guilty of rape in the second degree, but that, if they had any reasonable doubt as to any of the above elements, they should acquit him. The court also defined what it took to constitute "chaste and virtuous character" in accordance with the decisions of this court. No exceptions were taken by defendant to either of these instructions. The jury found the defendant guilty of rape in the second degree, and left the punishment to the court. The court sentenced him to a term of eight years in the penitentiary. Under the evidence as heretofore outlined the jury could have found the defendant guilty of rape in the first degree, and, under the testimony, and authorities, this court would have sustained the judgment and sentence. But the jury saw fit to find the defendant guilty of rape in the second degree. This court has held in the case of Hinson v. State, 29 Okla. Cr. 210, 232 P. 955, 957, that where a defendant was charged by information with the crime of rape by force, and is convicted of rape in the second degree, he cannot complain that the court charged the jury with reference to the law of rape in the second degree, and where no exception or objection was taken to this part of the charge in the court below. The court says:

"Sections 2694, 2739, and 2740, Comp. Stats. 1921, [Okla. Stat. 1931, §§ 3091, 3096, and 3097, 22 Okla. St. Ann. §§ 837, 915, 916] in substance, provide that a defendant may be convicted of the offense charged, or of any lesser degree thereof, or of any offense necessarily included within the charge.

"This court is firmly committed to the rule that, if the evidence demands a conviction of a higher degree of the offense charged than that for which he was convicted, and does not warrant an acquittal, the defendant is not entitled to a new trial on the ground that, under instructions so permitting, the jury found him guilty of a lower degree."

Also, in Hunter v. State, 6 Okla. Cr. 446, 119 P. 445, it was held:

"If error has been committed by the conviction of a defendant for statutory rape in the second degree, when

under the evidence he should have been convicted of statutory rape in the first degree, the defendant cannot be heard to complain because the error was clearly to his advantage. The law never considers a question of error except in behalf of those who are injured thereby."

See, also, Penn v. State, 13 Okla. Cr. 367, 164 P. 992, L.R.A. 1917E, 668; Steward v. State, 9 Okla. Cr. 327, 131 P. 725; Wilmoth v. State, 20 Okla. Cr. 453, 203 P. 1055, 21 A.L.R. 590; Lytton v. State, 12 Okla. Cr. 204, 153 P. 620; and Irby v. State, 18 Okla. Cr. 671, 197 P. 526.

It is strongly urged by defendant in his brief that the law of this state is that in a case of rape that "there must be the utmost of force and the utmost of resistance," and cites the cases of Sowers v. Territory, 6 Okla. 436, 50 P. 257, and Parker v. Territory, 9 Okla. 109, 59 P. 9. It will be noted that these cases were decided by the territorial court prior to statehood. In so far as they adhere to the old doctrine with its strict construction that "there must be the utmost of force and the utmost of resistance," they have not been followed by this court since statehood, and are not in harmony with the true rule as now followed by the more modern decisions. In the case of Bulls v. State, 33 Okla. Cr. 64, 241 P. 605, 606, this court, speaking through Judge Doyle, says:

"The old rule of 'resistance to the uttermost' is obsolete, and is repudiated by the more modern authorities. The law does not require that the woman shall do more than her age, strength, the surrounding facts, and all attending circumstances make it reasonable for her to do in order to manifest her opposition. In reference to the degree of resistance required, the jury should be instructed that it is necessary, not that the prosecutrix should have made the uttermost resistance, but that she has made such resistance as she was capable of making at the time. See 33 Cyc. 1506, and cases cited."

And in Snider v. State, 40 Okla. Cr. 214, 267 P. 687, the court says:

"In this state to constitute rape by force it is not essential that resistance be to the utmost, but need be only such as to make nonconsent and actual resistance reasonably manifest."

In Sherrill v. State, 47 Okla. Cr. 275, 287 P. 747, 748, Judge Davenport, speaking for the court, says:

"To support a charge of rape, female's resistance need only to be such as to make nonconsent and actual resistance reasonably manifest, having regard for her age, strength, and surrounding circumstances."

This rule is in harmony with the more modern decisions. 52 C. J. pp. 1019 and 1020, says:

"Although there is authority that there must be the utmost reluctance and the utmost resistance, the rule of 'resistance to the uttermost' has been expressly repudiated; and even where the term 'utmost resistance' is still employed, it is held to be a relative term, which actually means the greatest effort of which the woman is capable to foil the assailant and preserve the sanctity of her person. Too, it has been stated that the requirement that the act be without the female's consent or against her will signifies that it be committed against the utmost reluctance and against the utmost resistance which she is capable of making, and that the female's opposition of the man to the utmost limit of her power is the test of resistance. Thus the prevailing rule is that there must be the most vehement exercise of every physical means or faculty within the female's power to resist penetration, and a persistence in such resistance until the offense is consummated. The female need not resist as long as either strength endures or consciousness continues. Rather the resistance must be proportioned to the outrage; and the amount of resistance required necessarily depends on the circumstances, such as the relative strength of the parties, the age and condition of the female, the uselessness of resistance, and the degree of force manifested, which rule is in some jurisdictions expressly adopted by statute. Stated in another way, the resistance of the female to support a charge of rape need only be such as to make nonconsent and actual resistance reasonably manifest. The female need resist only until physical penetration occurs, when the crime is complete, and her failure to resist after that is

immaterial; and she need resist only until resistance becomes so useless as to warrant its cessation. Further, the resistance must be in good faith and not a mere pretense, or, as stated otherwise, it must be real or genuine and active, and not feigned, or passive, or perfunctory."

In the case of Watson v. Taylor, 35 Okla. 768, 131 P. 922, 924, the Supreme Court of this state gives a very full discussion of this question and gives in an elaborate manner the reason for the rule above announced. The court says:

"It is not often that such an assault is or can be described by a female with that complete fullness of detail with respect to every word spoken or every fact and circumstance that may enter into the questions of consent or resistance. When the proof is given, as it sometimes is, in general terms, the jury must still be satisfied that there was no consent, and that resistance was made to the extent of the woman's ability. What that ability was must in many cases depend not only upon her strength and power to defend herself or make herself heard, but also upon the element of fear, when it exists. The age, strength, and physical appearance of the parties, with the manner in which they testify, are elements of some importance which the jury may consider with all the other facts. The relation which the parties bear to each other, as in this case, may also be considered. Where on one side we find extreme youth, inexperience, and dependence united with the principle of fear and obedience, and, on the other, mature age, great physical power, and dominating influence and control over the movements and will of another, the question of consent and resistance must be determined with reference to those conditions.

"When such a case arises, who is to determine when, as in this case, the girl, in stating the occurrence, states that she did not consent and did resist to the best of her ability, whether she tells the truth or not? Can this court, after the jury have accepted the plaintiff's version of the transaction and the General Term has approved the verdict, say, as matter of law, that there was no evidence for the consideration of the jury? This, I think, would be to transcend the limits of our jurisdiction as a court of law, without power to review disputed facts. * * *

"Moreover, our statute provides (section 2353, Comp. Laws, 1909 [Okla. Stats. 1931, § 2515, Okla. St. Ann. tit. 21, § 1111, p. 464]) that all that is required to constitute the crime of rape is an 'act of sexual intercourse accomplished with a female, not the wife of the perpetrator * * * where the female is over the age of 16 years and under the age of 18, and of previous chaste and virtuous character.' The language of the statute is clear and unambiguous. It clearly eliminates the elements of consent and resistance from the case of an assault upon the class of females therein described. Its manifest purpose is to throw a protecting mantle about the female children of this state within certain ages, which the hand of the libertine may not withdraw except at his peril. The statute in effect says that chastity is such a precious jewel in the crown of maidenly graces, that it cannot be stolen or removed therefrom even with the consent of the wearer, without offending the majesty of the law."

The facts in the case at bar are in a great many respects similar to the authorities cited above and the argument there stated applies here. The evidence of the prosecutrix and her girl friend, Beatrice Barker, reveals that she made the greatest effort of which she was capable, and with the faculties which she had to foil her assailant and preserve the sanctity of her person. She was a young girl, 17 years of age. The defendant was a grown married man, 29 years of age. He was the father of a child, nine months old. His desire for lust led him to seek out this young girl and take her from her friends and loved ones with the thought always in mind of securing her debauchery. At the first opportunity he stopped his truck and demanded that she get out that he might accomplish his purpose. She refused, and he pulled her out, not only once but at several different times. She screamed and fought and hit the defendant on the head with a rock which she secured. When defendant was arrested the next day, his face bore this mark. His statement that he had been robbed and slugged in Muskogee was probably not given much weight by the jury, and was about as unreasonable as his

story that his truck was about to hit a little pig running across the road on the night of July 4th, and that the girls received their injuries in this way. The evidence, in so far as resistance is concerned, would have brought it within the rule of "uttermost resistance," certainly it was within the rule that she did as much as her age, strength, and surrounding circumstances made it reasonable for her to do. The defendant testified that prosecutrix and her girl friend had accompanied him and Bill Stevens to the Caney picnic in his truck. This testimony is contrary to every witness placed upon the stand, and even by witnesses offered by the defendant himself. The prosecutrix, at the very minute she returned to her home, informed her parents of the outrage that had been perpetrated upon her, and requested her mother to call the sheriff of the county, who lived in close proximity. Her clothes were torn and bloody; her body was bleeding and bruised; and every physical fact corroborated her story that she had resisted to the "uttermost," and certainly "with all the strength that her age and the attending circumstances made it reasonably possible for her to do."

With reference to the contention that the state did not prove that prosecutrix was of chaste and virtuous character, this question was presented to the jury by the court. Under all the facts and circumstances in this case, the undisputed evidence showed that she was only 17 years of age. The evidence offered by defendant showed no act of intercourse by her with any one except the defendant; that she was in company with a party who had been her sweetheart prior to his marriage and was hugged and kissed by him, and especially during the time that he was separated from his wife, is not evidence of illicit relations between them. Most of the witnesses offered by defendant to give circumstances with reference to her company with others were impeached by officers and other witnesses who testified in this case. The jury heard and saw the witnesses and they accepted the state's theory of the case and found the defendant guilty. It is not the province of this court, as a matter of law, to

say that they were wrong in their conclusion. As a matter off fact, the evidence here shows that this court would have been warranted in affirming this verdict if the defendant had been found guilty of rape in the first degree. Under these circumstances, as above indicated, he will not be heard to complain that the jury in its leniency gave him a lesser punishment by only finding him guilty of rape in the second degree.

The contention of counsel that section 3108, Okla. Stats. 1931, Okla. St. Ann. tit. 22 § 927, p. 204, is unconstitutional because the jury found the defendant guilty of the crime of rape and left his punishment to be fixed by the court, and that therefore he was deprived of his right to trial by jury, is untenable. No authorities are cited to sustain this contention, and we do not think any could be had.

The statement of the county attorney, in his closing argument, is not such that would have influenced the minds of the jury and require a reversal thereof. The record does not show that an exception was taken by the defendant to this statement as required under the law of this state.

For the reasons above stated, the judgment of the district court of Adair county is affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.