## ADAM LYTTON v. STATE.

No. A-2250.   Opinion Filed December 29, 1915.

(153 Pac. 620.)

**HOMICIDE—Harmless Error—Conviction of Lesser Crime.** In a prosecution for murder, where the court submits the issue, and the jury find the defendant guilty of manslaughter in the first degree, where the law and the facts make the crime murder, the fact that the jury found the defendant guilty of a lower degree than that established by the evidence, is an error in his favor, of which the defendant cannot complain.

(Syllabus by the Court.)

*Appeal from District Court, Kingfisher County;*
*James B. Cullison, Judge.*

Adam Lytton, convicted of manslaughter in the first degree, appeals.   Affirmed.

*W. A. McCartney* and *Daniel W. Lewis,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J.   Plaintiff in error, Adam Lytton, herein referred to as the defendant, was convicted of manslaughter in the first degree on an information filed in the District Court of Kingfisher county on the 10th day of October, 1913, wherein it was charged that the said Adam Lytton in said county, on the 9th day of September, 1911, did kill and murder one Orville H. Smith, by shooting him with a pistol.   In accordance with the verdict of the jury on November 1, 1913, the court rendered judgment and sentenced the defendant to imprisonment in the penitentiary for the term of ten years.   From the judgment he appealed by filing in this court on April 29, 1914, a petition in error with case-made.

The material facts, as we believe the evidence established them, are as follows:

The deceased, Orville H. Smith, a white man with his family lived on a farm in Kingfisher county, near the old town of Zion. The neighborhood was largely populated by negroes who on the day of the tragedy were having a picnic with his permission in a grove on Mr. Smith's place. Mike Hughes, a white man missed a bottle of whisky which he had bought there and had wrapped up in a "slicker," that was tied to the saddle on his horse. He saw some negroes drinking the whisky and asked Mr. Smith to help him get his whisky back. Mr. Smith asked the negroes to give the whisky to Mr. Hughes. The negroes denied that it was Hughes' whisky, and Hughes told Motie Jones who held the bottle that they could have the whisky, and they commenced to drink it. Mr. Smith said it was a shame to steal a man's whisky, and Motie Jones said, "God damn you, you cannot accuse me of stealing," and drew a knife or razor and advanced on Mr. Smith, who stepped back and drew a pistol, saying: "Don't you advance on me with that knife, you damn black son-of-a-b—h," and fired two shots in the air. The defendant Lytton stepped up behind Smith and struck him on the back of the head. Smith fell forward and dropped the pistol and the defendant Lytton grabbed it and fired two shots at Smith, saying as he fired each shot, "Get up, you damn son-of-a-b—h." One bullet entered the right side between the ninth and tenth ribs, took a downward course penetrated the intestines, coming out behind the pubic bone.

Dr. Edward Underwood testified that he was a practicing physician at Crescent and in answer to a telephone call went to Mr. Smith's place and found him lying where he was shot; that he had him taken to the house and dressed the gun-shot wound; that he also found a bruise and abrasion on the back of the head, apparently made by some blunt instrument; and that blood was oozing from one of his ears; that he arrived at Mr. Smith's place about eight o'clock in the evening and stayed with Mr. Smith until he died at one o'clock p. m., the next day.

The defendant Lytton made his escape and was arrested about two years later in the city of St. Louis, where he was living under an assumed name.

There is but very little conflict in the testimony of the witnesses to the tragedy.

The defendant as a witness in his own behalf testified that he had been convicted of the crime of assault with intent to kill in the District Court of Logan county, Oklahoma Territory, and was sentenced to serve a term of five years' imprisonment in the penitentiary at Lansing, Kansas; that after serving three years and eight months of his sentence he was pardoned on the 18th day of March, 1906; that he was at the picnic held near Zion on the 9th day of September, 1911, and that evening found a bottle of whisky in the grass about thirty rods from the dancing platform; that Jim Nesbit, Ike Dickerson and Motie Jones were with him at the time and they went over to Claud Anderson's house and each took a drink; and he handed the bottle to Motie Jones. They then started back to the dancing platform and stopped in a thicket where they all took another drink. Orville Smith and Mike Hughes came up and Hughes said: "Boys, that's my whisky you have got there, isn't it." The defendant Lytton answered, "No I found this whisky." Smith said: "That is his whisky Motie, give the man his whisky and let it go, and Smith and Motie got into a squabble; that witness moved around and got by the side of Hughes' horse; that Smith said "Get back Motie, get back God damn you, don't you come up on me with that knife," and fired two shots saying, "I will kill all you God damned sons-of-b—hes."

His further testimony is as follows:

"Then I runs up and grabs him and I and him gets to scuffling and I had hold of the barrel and in the fall the gun went off and it burnt me and I turned the gun loose and when he fell on his back he threw his hand back over here (witness indicates). I steps back and looks over and sees the gun and reaches over and gets the gun; I stepped back and said 'Get up, get up.' He said, 'I can't get up you have killed me now.' I said 'Get up, get up and fight for yourself,' he said, 'I can't get up and I shot again; I shot after I first told him to get up. When I fired the gun I aimed to shoot them two loads out of it and put the gun away. I didn't have any idea that Orville was

shot and then if he wanted to fight we could fight it out, but I wanted to get rid of the gun. In the meantime somebody comes up and snatches the gun away from me.

"Q. Did you shoot Orville Smith? A. No, sir, I didn't shoot him. .

"Q. Did you have your hand on the trigger of the gun at the time it was fired, or at the time it fired the ball into the body of Orville Smith? A. No, sir, I had my hand on the barrel of this gun, I suppose that the ball went into his body, I do not know where it went.

"Q. Did either of the two shots you fired out of the gun hit Orville Smith? A. No, sir, it did not.

"Q. Did you strike Orville Smith on the back of the head with anything? A. No, sir, I did not."

The assignments of error are based upon objections to the charge of the court and are in effect that the trial court erred in submitting the issue of self-defense; also that the court erred in failing to define manslaughter in the second degree.

It is a sufficient answer to the contentions made to say that we think after a careful survey of the facts in evidence, that there was no element of self-defense in this case. Considering the testimony of all the witnesses in the case excepting that of the defendant, there is no doubt in our minds that the homicide was a deliberate and premeditated murder, and while the defendant's account of the killing differs somewhat from that given by the other witnesses, he is, we think guilty of murder upon his own statement. It would seem that the demands of justice, and the protection of society, clearly required in this case that the penalty prescribed by the law for the punishment of the crime of murder should have been imposed upon the defendant, however, the court submitted the question of manslaughter in the first degree, and the jury found the defendant guilty of this lower degree. It is the province of the jury, if the defendant is found guilty, to determine and fix the degree by their verdict, and it has been uniformly held by this court that if the jury in a homicide case find the defendant guilty of a lower degree, where

the law and the facts make it murder, it is an error in favor of the defendant of which he cannot complain. Juries frequently render just such verdicts, and this can only be accounted for upon the theory that the verdict was the result of a compromise of opinion.

It follows that it is our duty to affirm the judgment. The judgment of the District Court of Kingfisher county is affirmed.

FURMAN and ARMSTRONG, JJ., concur.