## GREEN BELL v. STATE.

No. A-3686. Opinion Filed Dec. 13, 1921.

(202 Pac. 325.)

(Syllabus.)

1. **Homicide—Conviction of Murder Sustained.** .In a prosecution. for murder, evidence held sufficient to support the verdict of conviction and assessing imprisonment for life as the punishment.

2. **Appeal and Error—Discretion of Court—Continuance.** An application for continuance is addressed to the sound discretion of the trial court, and this court will not reverse a judgment for refusing to grant a continuance; unless it appears that the trial court has manifestly abused its discretion in refusing it.

3. **Jury—Disqualification of Juror—Waiver by Failure to Object.** A known ground of disqualification of a juror before or during the progress of the trial is waived by withholding it, or by failing to make objection until after verdict.

4. **New Trial—Grounds—Disqualification of Juror.** As a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify a juror on a challenge for cause which existed before the juror was sworn, but which was unknown to the defendant until after verdict, unless it appears from the whole case that the defendant suffered injustice from the fact that the juror served in the case.

5. **Appeal and Error—Grounds for Reversal—Temporary Absence of Judge During Argument.** A judgment of conviction will not be reversed because of the action of the judge in leaving the courtroom and stepping into his chambers during the argument of counsel to the jury, where the record fails to show that he was out of hearing of the proceedings. The test in determining whether the absence of the judge from the bench during the progress of the trial calls for a reversal of the judgment is whether, by his absence, he loses control of the conduct of the trial. If he does, the integrity of the trial is destroyed; but, to justify a reversal on that ground, the fact must clearly appear from the record.

Appeal from District Court, Atoka County; A. A. McDonald, Judge.

Green Bell was convicted of murder, and he appeals. Affirmed.

J. W. Clark and J. G. Ralls, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

DOYLE, P. J. Plaintiff in error, Green Bell, was convicted of the murder of his wife, and his punishment assessed at imprisonment for life. He appeals from the judgment rendered on such conviction.

The information charged the defendant with having feloniously administered to his wife, Annie E. Bell, one-half grain, more or less, of strychnine, a deadly poison, from the effects of which she died.

The state introduced testimony tending to prove the following facts:

The defendant, 44 years of age, resided in Atoka county, one-half mile west of Farris. On October 15, 1916, he married the deceased, whose age was 24 years; at the time of her death, August 11, 1917, she was pregnant; about 10 o'clock that night the defendant came to Mr. Story's place, a quarter of a mile east of his home, and asked him to come quickly, that he believed his wife was dying; Mr. Story and his wife went to the defendant's place, and found the deceased in intense agony; Mrs. Story testified:

"We heard a woman screaming when we were about 100 yards of the defendant's house; Mrs. Bell was on the bed; she was choking, and had a convulsion which lasted about a minute; then she seemed quiet for a few minutes, then screamed, and had another convulsion; in about five minutes she had another convulsion, and died. I called the defendant; he came into the room and went to the dresser and felt in a drawer for something, then left the room; when he returned, I asked him if she had taken poison, and he said she had taken a dose of quinine before going to bed; that there was no poison on the place."

Dr. H. F. Hill testified:

"I live at Farris; I was called to Green Bell's place and found him and Mrs. Story there; Mrs. Bell was dead, but she had not been dead but a few minutes; the defendant said, 'Doctor, you are too late.' I asked him if she had taken anything; he said she had taken a dose of quinine just before going to bed. About a month, maybe more, before her death, I let the defendant have some strychnine tablets; he told me he wanted to poison a dog; I poured them out in my hand, and said, 'There is enough here to kill a dozen dogs,' about a week after he got the strychnine he asked me what effect it would have on a person, and I told him as near as I could. I asked him that night if I had better notify the insurance company, he said, 'No.' The next day I went over to his home and told him that I had decided to notify the insurance company about his wife's death; it would look bad not to. He said, 'What will they do?' I said, 'I don't know; they might not do anything; then they might send a detective here, and maybe take up the body and take out the stomach and analyze it.' He said, 'They will never cut on my wife; I will die and go to hell before I will let them.' The next day he called me up to sign the death certificate, and I signed it. He had a six-shooter on, and said, 'Have you heard anybody insinuating that I poisoned my wife?' I said, 'Nothing, Green.' He said, 'If I hear of anybody insinuating I poisoned my wife, I will kill them before Saturday night.' "

J. R. Story testified:

"My wife and I found the defendant standing on his back porch; she went in, and the defendant said, 'Rube, what on earth will I do? They will hang me.' I said, 'What on earth is the matter, Green?' and I passed in. Mrs. Bell was lying on the bed screaming; her head was drawn back, and her arms were jerking; she said to my wife, 'Pray for me,' and 'What makes me do this way?' My wife said, 'I don't know.' I said, 'I am going after Stanley and his wife.' "

S. J. Barnett testified:

"About a week before his wife's death the defendant told him that he had his wife's life insured for $10,000 and his own for $500, and he said, 'If she died that he would not be a poor man in his old days.' "

Arthur Neeley testified:

"I was carrying the mail from Antlers to Farris; about the middle of July I brought some oil and strychnine from Antlers for Mr. Bailey; when I delivered it, Bailey, the defendant, and others were present; the defendant said he would settle for it in a few days; about the 27th or 28th of July there was a picnic at Darwin, and the defendant met me there at the post office, and told me he would settle with me; I said, 'Does that include the strychnine for Mr. Bailey?' He said, 'Yes, I will settle for all of it;' and he paid me for it."

Mrs. Lillie Gist testified:

"Deceased was my sister; just a week before her death I visited her; at the supper table the defendant put down his knife and fork and said, 'Lillie, I am just nearly worried to death about this old policy; if Annie should die suddenly everybody would think I poisoned her.' His wife said, 'Green, you are not thinking about poisoning me?' He said, 'Oh, no; I would not do that for anything in the world; there is not any poison on the place.' He turned to me and said, 'Lillie, did you ever see any strychnine?' I said, 'I imagine it is like quinine.' The day after the funeral he told me if the insurance men came around asking questions just tell them that she was six or seven months gone. I told him I was going to tell the truth. He said, 'Tell them the truth if they break my neck.' Then he asked me, 'Do you think she was poisoned?' and before I could reply he said he would shoot the heart out of the first one that told him he poisoned her. I did not say anything. He said, 'Do you want her taken up?' I told him I didn't know. He said he was not going to have her taken up; that he would lose the policy first, and he would shed the last drop of blood in his body before he would have her taken up. I saw my sister the afternoon before she died that night, and she was apparently in good spirits and in good health."

The deceased, according to the testimony of the state's expert witnesses, had all the symptoms of strychnine poisoning. A chemical analysis of the contents of the stomach disclosed one and three-quarter grains of strychnine, and a portion of the

liver was found to contain three-sixteenths of a grain of strychnine. The defendant had taken out two insurance policies of $5,000 each upon the life of the deceased.

For the defense, Dr. D. D. Henderson, a physician and surgeon, located at Caney, in answer to a hypothetical question stated that—

"The deceased's symptoms indicated puerperal eclampsia, which is a condition brought about in a woman carrying a foetus due to pressure on the circulatory system as well as the nerves."

As a witness in his own behalf defendant stated that—

"In the month of February, I got 8 or 10 strychnine tablets from Dr. Hill; I told him I wanted them to kill a dog; I put these tablets in a biscuit and put it out by the back door; it was gone in the morning; I told Cecil Bailey to write an order for the mail man to get some cup grease at Antlers, and I would pay for it; Cecil Bailey, Rube, Jim, and Bose Story and myself were working on a bridge when the mail man delivered the order. He said, 'Green, here is your grease you ordered,' and handed it to Cecil Bailey; I did not see any strychnine. Afterwards, Cecil Bailey said to me, 'Green, I ordered a dime's worth of strychnine in that order, and I did not have the money to pay for it,' and said he gave the strychnine to his hogs. In March me and my wife made applications for insurance policies each for $5,000; that night my wife wanted to know why I did not take $10,000; I met the agent the next day at Farris and asked him if it could be doubled, and he said it could. I told him, 'I can't pay this all in cash; you can double it if you will take some notes.' The agent said, 'I can handle the notes.' I paid $100 in cash and gave notes for $350. Before my wife went to bed that night she took a dose of quinine in a No. 1 capsule, which she filled herself out of a bottle. Thirty or forty minutes after going to bed my wife screamed; I jumped out of bed and lit the lamp. She said, 'Rub my arms.' I said, 'What is the matter with you?' She said, 'I don't know.' I said, 'I had better get a doctor.' She said, 'Wait.' About that time she screamed again, and I rubbed her arm again. I

said, 'I am going to get Mrs. Story.' She said, 'No.' I said, 'I don't know what to do.' She said, 'Wait a minute.' I went to Mr. Story's as hard as I could go; I don't remember what I said, only I wanted them to come to my house as soon as they could. When I returned I said, 'How do you feel, baby?' She said, 'I don't know hardly.' I heard Storys coming, and I went out to meet them; when I went in, she said, 'Green, don't leave me.' I did not at any time feel her or notice her jerk, and I did not notice anything peculiar about her mouth, and her body was not drawn or anything of that kind.

"My wife died Saturday night, and was buried Sunday evening. The next day Dr. Hill asked me if I would be willing for the insurance parties to dissect her body, and I told him 'No.' The next day he asked me again, and I said, 'Yes, Doc; if you want to dissect her body, I am willing.' I did not say anything to Mrs. Lillie Gist about being worried over the insurance policy. I made no threats whatever about shooting anybody that accused me of poisoning my wife."

The defendant filed a motion to set aside the information, on the ground that—

"There was no legal or competent evidence introduced on the preliminary examination tending to prove that the crime of murder had been committed, or probable cause to believe that this defendant was guilty of the offense."

In support of this motion a transcript of the testimony introduced by the state on the preliminary examination was offered.

The first error assigned is the overruling of the motion to set aside. The testimony upon the preliminary examination was in substance the same as the testimony of six witnesses upon the trial, and was undisputed. It is sufficient to say that the motion to set aside was without even a semblance of merit, and was very properly overruled.

The sufficiency of the information is not questioned in the brief, and we find that it is sufficient, and that the demurrer thereto was properly overruled.

The next error assigned is the overruling of the defendant's motion for a continuance. The alleged offense was committed August 11, 1917. The defendant was arrested August 15, 1917. The information was filed in the district court of Atoka county August 28, 1917.

On the 10th day of July, 1919, the case was called for trial, and the defendant filed a motion for continuance on the ground of the absence of one Cecil Bailey, a material witness, without whose evidence it is alleged defendant could not safely proceed to trial. In his affidavit the defendant stated that Cecil Bailey, if present, would testify that an order was given by the defendant to Arthur Neeley to procure some oil at Antlers; that said order was written by said Bailey; and below said order said Bailey wrote an order for 10 cents worth of strychnine for himself; that said orders were on the same sheet of paper, but that the order for the oil was signed by the defendant, but the order for the strychnine was signed by said Bailey; that said Bailey received the strychnine ordered, and put it in slop that he fed to his hogs; and that he did not give it or any part of it to the defendant; that on June 17, 1919, a subpoena was issued for said witness, which was returned, showing that said Bailey could not be found in the county; that thereafter the defendant was informed that said Bailey was in the oil fields near Electra, Tex.; that immediately he sent one T. S. Ralls to the Electra oil fields, and furnished him money to pay the expense of said Bailey's attendance; that said Ralls made due search for said Bailey in the Electra oil fields, and said Bailey was not there; that said Ralls was informed that said Bailey had left there about 2 weeks prior, and was talking about going to the oil fields at Ranger, Tex.

The well-established rule is that an application for continuance is addressed to the sound discretion of the trial court, and this court will not reverse a judgment of the trial court upon the ground that it refused to grant a continuance unless it appears that such court has manifestly abused its discretion in refusing it.

There is no statement in the affidavit that this was the only witness who had knowledge of the facts which he expected to prove by the absent witness; no sufficient facts are set out in the affidavit by which the court could see that the testimony of the absent witness would ever be obtained, which is necessary when the witness is out of the state, and cannot be reached by process of the court. We think the affidavit does not disclose such diligence on the part of the defendant to procure the attendance of this witness or to have his deposition taken as the law under the circumstances of the case required. For reasons not disclosed by the record, nearly two years had elapsed from the filing of the information until the case was called for trial. In our opinion the affidavit presented no facts which, in the exercise of sound discretion by the court, would have warranted a further continuance of the case, and the motion was properly overruled.

One of the grounds of the motion for new trial and assigned as error is that one of the trial jurors, H. Burress had formed and expressed an opinion adverse to the defendant previous to his being sworn as a juror. In support of the motion for new trial, J. H. Gernert testified that the juror Burress met him on the street and said, "Tell me something about the case—all the facts in the case coming up tomorrow," and I said, "I could not, because it would be contempt of court," and I said, "Don't you read the paper?" and he laughed and said he ought to be hung; he also said they were to have a school election in his district, and he would not be there; I judged that he wanted to disqualify.

The record in this case contains no recital of the examination of the jurors on their voir dire.

One of the attorneys for the defendant testified:

"I examined the jurors on their voir dire, and I asked each juror whether or not he had formed or expressed an opinion as to the guilt or innocence of the defendant, and this juror answered he had not, and I asked him if he knew of anything that would prevent him from trying the case fairly and impartially if selected as a juror in the case, and he said he did not."

In Horton v. State, 10 Okla. Cr. 294, 136 Pac. 177, it is said:

"It is a settled rule of this court that the finding of the trial court upon a question of fact, arising upon affidavits and evidence adduced on a motion for new trial, will not be disturbed where the evidence reasonably tends to support such finding. * * *

"A defendant must exercise all the rights that he has under the statutes to find out whether or not a juror is qualified before he can take advantage, after verdict, of such juror's incompetency or disqualification.

"A defendant cannot sit supinely by and allow disqualified and incompetent jurors to be selected to try him, and then take advantage of his own indifference or negligence, nor can a defendant call upon this court to presume that he asked a juror certain questions, in the absence of a showing in the record that such questions were asked. A known ground of disqualification of a juror before or during the progress of a trial is waived by withholding it or refusing or declining to raise the objection until after verdict."

In Stouse et al. v. State, 6 Okla. Cr. 415, 119 Pac. 271, it is said:

"It is well settled that, as a general rule, a verdict will not be set aside for reasons that would be sufficient to dis-

qualify on a challenge for cause which existed before the juror was sworn, but which were unknown to the accused until after the verdict, unless it appears from the whole case that the accused suffered injustice from the fact that the juror served in the case."

After a careful examination of the record now before us our conclusion is that the defendant had the benefit of a trial by a fair and impartial jury as required by law.

Another ground of the motion for new trial, and assigned as error, is that the court erred in leaving the courtroom during the argument of counsel. Upon the hearing on the motion for a new trial, the court made the following statement as a part of the record:

"When J. W. Clark was to commence his argument, I told him I had a long-distance call in regard to a sick child, and asked him if he wanted to be interrupted and recess court when I went to talk, or did he mind me stepping to the telephone without interrupting his argument, and he entirely agreed that I step to the phone. During the course of his argument I was notified the party was on the line. The telephone is located in the judge's chambers just one step out of the courtroom into the chambers. The room is not over 15 or 16 feet square, all doors were open, and I talked over the phone possibly a minute or minute and a half, and during the entire time could see a majority of the members of the panel from where I was standing talking at a desk phone, and I could hear every word that the said J. W. Clark was uttering. Immediately thereafter I came back into the courtroom and was seated on the bench."

Counsel for the defendant contend that, under the holding of this court in Wright v. State, 7 Okla. Cr. 280, 123 Pac. 434, the court committed reversible error in leaving the courtroom during the progress of the trial. It is admitted that no objection was made, and it is not claimed that anything prej-

udicial. to the defendant's rights occurred during the absence of the judge from the bench.

In Wright v. State, supra, it was held to be reversible error for the judge, in the trial of a criminal case, to leave the courtroom without suspending the proceedings until his return, whether his absence resulted in actual prejudice to the rights of the defendant or not. In the opinion it is said:

"It is error for the presiding judge of a court to vacate the bench and retire from the courtroom, or from the presence and hearing of the proceedings of the trial. A judgment of conviction cannot be sustained when the record affirmatively discloses such a condition. The presence of the judge as the presiding genius of the trial is as necessary during the argument as it is during the taking of the testimony, or at any other time during the progress of such trial."

And further:

"It is just as serious an error for the court to retire to a remote place in the courtroom, out of hearing and control of the proceedings in progress, as it would be to absent himself from the courtroom entirely."

The doctrine of the Wright Case has been approved by a later decision of this court. Stites v. State, 9 Okla. Cr. 596, 132 Pac. 822. We feel no disposition to impair the force of the rule announced in the Wright Case. The controlling difference between that case and this one is that in the present case the trial judge did not lose control of the conduct of the trial by reason of his absence from the bench during the progress of the trial.

The defendant in a criminal case has a right to the presence of the judge at every step of his trial, including the argument to the jury, so that he may enjoy the protection of the court against the slightest invasion of his rights by any improper remarks of counsel, misconduct of jurors, spectators, or

officers of the court, and it is the duty of the **judge to remain** within the hearing of counsel, so as to be able **instantly to** assert his authority, if demanded by anything **that may occur.** The determining test is, Did the trial judge lose **control** of the conduct of the trial by reason of his absence?

The burden was on the defendant to **show affirmatively** that the judge had lost control of the trial **by reason of his** absence from the bench. The record affirmatively shows that the judge did not even temporarily relinquish **or lose** control of the conduct of the trial. It follows that the motion for new trial on this ground was properly overruled.

The other assignments of error are not **sustained** by the record, and need not therefore be noticed. **As shown** by the record, the defendant has had a fair and **impartial trial,** and we see no reason to doubt that his conviction **was justified by** the evidence.

The judgment of the trial court is therefore **affirmed.**

MATSON and BESSEY, JJ., concur.