## B. M. WILMOTH v. STATE.

No. A-3741.   Opinion Filed Feb. 3, 1922.
(203 Pac. 1055.)

(Syllabus.)

**Homicide—Defendant May not Complain of Conviction of Manslaughter Where Facts Make Crime Murder.** In a prosecution for murder, when the court submits the issue, and the jury finds the defendant guilty of manslaughter in the first degree, in a case where the law and facts make the crime murder, it is an error in the defendant's favor, of which he has no cause to complain.

Appeal from Superior Court, Okmulgee County; R. S. Simpson, Judge.

B. M. Wilmoth was convicted of manslaughter in the first degree, and appeals. Affirmed.

Morgan, Pinkston & Hepburn, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

DOYLE, P. J.   Plaintiff in error, B. M. Wilmoth, was tried in the court below upon an information for the murder of Henry Simpson, but the jury, by their verdict, found him guilty of manslaughter in the first degree, and assessed his punishment at imprisonment in the penitentiary for a term of four years and six months.  He has appealed from the judgment rendered upon such conviction.

The following brief statement of the facts and the evidence will be sufficient to make clear the contentions made:

Henry Simpson, the deceased, 34 years old, a coal miner, at the time of his death was living at Henryetta with his wife and three children.  About 3 o'clock Sunday morning, March 23, he was shot by the defendant and dropped dead.  Saturday evening, March 22, 1919, deceased in company with Will and Gardner Croy, went out to Colletti's in Henry Baker's car.  While there the defendant, Wilmoth, Tom Blevins, and Jim Johnson came in, the defendant told Colletti he was off the police force and was not going to bother him and asked for something to drink.  Will Croy, Henry Baker, and deceased left Colletti's and went to dance at Mrs. Henderson's, arriving there about half past 10.  About half an hour later the defendant, Tom Blevins, and Johnson came there.  Gardner Croy was with them and was very drunk.  His brother Will and deceased took him in Henry Baker's car; then returned to the dance.  About 12 o'clock the dance broke up, and Will Croy, Henry Baker, and deceased started home and stopped the car at Rook's place, and all three went in the house; then they went out in the yard, and the defendant, Tom Blevins, Johnson, and others were there.

Will Croy testified:

"Tom Blevins hit Henry Simpson, and the fight started. It was a fair fist fight. I heard somebody say, 'Take him off, I have got enough,' and the last I saw of Blevins he was running towards town. The defendant and Johnson started towards the house; then the defendant came back and said to Henry Simpson, 'You done my friend damn dirty,' and Henry said, 'I don't know Slim; just a fair fist fight.' The defendant said, 'What do you fellows want to be fighting for?' and pulled his pistol out of his pocket and shot Henry Simpson and shot me. A minute or two before he was shot Henry Simpson said to the defendant, ' I ain't afraid of any God damn car thief.' Henry Simpson did not have a weapon of any kind. At Henderson's place I saw the defendant take a revolver out of his pocket and say, 'I have a notion to shoot that hat off the bed.' When he said that a woman took her baby off the bed and said, 'Don't do that, Slim; you will shoot my baby.' He laughed and said, 'I didn't aim to shoot your baby.' ''

Henry Baker testified:

"I am a coal miner. I drove my car up in front of Central Drug store that evening. Henry Simpson and the Croy boys got in my car, and we drove out to Colletti's place and were drinking some choc, when the defendant and Tom Blevins and Johnson came in. Henry Simpson and Will Croy and I left there together and went to a dance at Henderson's. While we were there the defendant, Tom Blevins, and Johnson came there. Some one said, 'Here comes the law.' The defendant said he was not the law; just old Slim out here for a good time. The first thing I knew the defendant was standing by the door with his gun. I heard him say, 'I believe I will shoot that hat off the bed,' and a woman said, 'Slim, don't do that,' and took her baby off the bed. He put his gun back and said, 'I was not going to do that anyway.' I heard him say there a half dozen of times, ' I am the meanest son of a bitch that ever hit Oklahoma.' We left Henderson's place and started home. We heard a graphophone at Rook's and stopped and watched the dancing, and went out to the back end and drank some choc. The defend-

ant got to cussing again and telling how mean he was. Rook ordered him out of the house. The defendant pulled his gun out, and Rook said, 'You think because you have been the law you are a bad man; if you don't get out, I will shoot you in two.' The defendant said, 'All right,' and walked out. About 30 minutes afterwards the defendant started to come in and old lady Rook grabbed his gun, and he put it in his pocket and said, 'I ain't going to do nothing.' I was in the house when the shooting occurred."

Fannie Bannerman testified:

"I was at the dance at Henderson's, and left there in company with the defendant, Jim Johnson, Maggie Fanti, and another girl; I don't know her name. We went to Rook's house. The defendant had a policeman's uniform on. Everybody was drinking choc. I saw the shooting. I didn't hear Henry Simpson say anything before he was shot. He fell just in front of me. I saw the flash of the gun when the defendant fired at Will Croy. Johnson was standing there and said, 'Slim, you have pulled off a bonehead.' I said, 'Ain't you ashamed of yourself, Slim?' and one or the other said, 'Let's go to town.' "

The defendant as a witness in his own behalf testified:

"I was acquainted with Henry Simpson and Bill Croy probably four years. I never had any trouble with either one of these men until that morning. The night before I was standing in front of the post office. Tom Blevins came along in a car with his driver, and we went out to Colletti's. We stayed there about an hour. When we left there Gardner and David Croy left with us. We came back to town about 11 o'clock, then we went over to Rich Hill to a dance. I had a gun. Some one asked was I still the law. I said, 'I am not working now,' and some one said, 'Old Slim has not got a gun.' I said, 'Yes; I have a gun'; and held it in my hand, a 32. A redheaded fellow had his hat on the bed. I held the gun up, and this woman screamed and said, 'Oh, Lordy mercy! don't shoot my baby.' I told her I was not going to shoot her

baby. That is all that took place there. Between 2 and 3 o'clock I left in a car with Jim Johnson. There were two or three other fellows in the car. Fannie Bannerman was not in the car. I was looking for Tom Blevins. Johnston stopped the car at Rook's place. I asked him if I could see if Blevins was there. He said, 'I haven't got time; I have three passengers, but I will come back in a few minutes.' I went in and saw Henry Simpson, Bill Croy, and Fannie Bannerman there. She was drunk. Henry Simpson told me that Rook was making trouble and wanted to kill somebody, and he pulled a gun out of his pocket and showed it to me. I went in the house and asked if they knew where Blevins was. Some one said, 'He might be out the back way.' Rook said, 'You boys haven't treated me right.' I said, 'You don't want to kill me do you?' I had my hand on my gun, and old lady Rook ordered me out of the house. I went to the joint on the back of the lot and found Tom Blevins there. Henry Simpson, Bill Croy, and Jim Johnson went back with me. As we walked up Blevins came out of the joint drunk, and Henry Simpson hit him right in the face, and hit him again. He fell, and Simpson got on him. I started to take Simpson off of him. Bill Croy had a club in his hand and said, 'Stand back everybody.' I told Johnson to get Henry off of Tom, and I pushed Bill Croy back. Johnson took Simpson off of Blevins. I never saw Blevins any more. We started out, and Simpson and Croy were following us up. Simpson asked me if I was going to throw him and Croy down. I said, 'Not necessarily, but you did a dirty trick beating up that fellow, and I don't like it.' He said, 'It is not any of your business; I don't care whether you like it or not,' and said he would do me the same way. I started on and told them not to follow me. They came on. Bill Croy had this club. As I turned around Simpson said, 'I know you have got a gun, but you are not the only fellow that has a gun; I am not afraid of you if you had a dozen guns; we beat your friend up and will do you the same way.' He put his right hand in his hip pocket and started towards me. I told him to stop. I would guess he was six or eight feet from me when I fired the shot. Bill Croy had the club in his hand when I shot him. When they fell I went back to see if Blevins was there. I

could not find him, so we got in the car and came to town. Three or four minutes after the shooting Fannie Bannerman came out of the choc joint. I had served about four years on the police force prior to this trouble, but I was laid off at the time. I still had my commission."

J. J. Johnson testified:

"I was running a jitney car between Henryetta and Dewar at that time. I had some passengers to Henryetta from the dance. The defendant got in the car. There were no women in the car. The defendant wanted to find Blevins, and left the car at Rook's place. I went on to Henryetta; then returned to Rook's place. When I went in the defendant was standing in the door. There was a racket of some kind. I asked the defendant if he was ready to go. He said he wanted to get Blevins; that maybe he was in the shack back there. We walked back. Blevins was standing by the door. The defendant said, 'There he is now.' About that time Henry Simpson struck Blevins and knocked him down. The defendant told me to pull Simpson off, and I did. Will Croy had something in his hand that he jerked off the side of the house. I said, 'Slim, let's go;' so we started. Henry Simpson and Will Croy kept following us. They were cursing. Slim asked them to stand back and let him alone; then he pulled his gun and fired the shots. I do not know whether Croy still had his club in his hand at that time or not."

In rebuttal Maggie Fanti testified:

"I left the Henderson house with Mrs. Bannerman and another girl and the defendant, Wilmoth, Johnson, and Happy Jack, and we went to Rook's. I heard Mrs. Rook order the defendant out of the house."

Fannie Bannerman, recalled, testified:

"I was out in the yard when the shots were fired, and I did not see a stick or weapon of any kind in the hands of Will Croy."

Don Stornmont testified:

"I went out to the Rook place soon after the killing occurred. Henry Simpson was lying on his back dead. I closely searched the body and did not find anything on him."

The first assignment of error is that the court erred in admitting testimony in regard to the conduct and conversation of the defendant at the Henderson place before the shooting occurred. It is not denied that all this occurred in the presence of the deceased. The defendant as a witness explained his conduct to the effect that he did not mean to harm any one at the time. We think it was competent to show everything that occurred there in the presence of each other as tending to show the state of mind of the defendant just before the killing, and it was competent as tending to show that the defendant, as a police officer, was carrying a pistol while under the influence of intoxicating drinks, in violation of section 2548, Rev. Laws.

It is claimed for the defendant that under the evidence he was either guilty of murder or should have been acquitted on the ground of self-defense, and that no instructions on manslaughter in the first degree should have been given.

The record shows that no objection was made or exception reserved to the instructions on manslaughter in the first degree. This court is committed to the doctrine that no prejudice can result to a defendant if convicted of a lower degree of homicide than warranted by the evidence. Lytton v. State, 12 Okla. Cr. 204, 153 Pac. 620; Irby v. State, 18 Okla. Cr. 464, 197 Pac. 526; Smith v. State, 20 Okla. Cr. 298, 202 Pac. 519.

In the Irby Case it is held that:

"In a prosection for murder, when the court submits the issue, and the jury find the defendant guilty of manslaughter in the first degree, in a case where the law and facts

made the crime murder, it is an error in the defendant's favor, of which he has no cause to complain.''

If the testimony for the state is to be believed, the killing of Henry Simpson was a most cruel and wanton murder. According to his own statement on the witness stand the defendant is guilty of manslaughter in the first degree, and we think he ought to be thankful that the jury dealt so leniently with him.

After a careful examination of the record, we conclude that there was no error which could have been prejudicial to the defendant.

The judgment of the lower court is therefore affirmed.

MATSON and BESSEY, JJ., concur.