Karl F. ABEL, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17072.

Court of Criminal Appeals of Oklahoma.

Jan. 24, 1973.

Rehearing Denied March 22, 1973.

Newcombe, Redman & Doolin, Lawton, for appellant.

Larry Derryberry, Atty. Gen., Michael Cauthron, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Karl F. Abel, hereinafter referred to as defendant, was charged and tried in the District Court of Comanche County for the offense of Murder and found guilty of First Degree Manslaughter. His punishment was fixed at twenty-five (25) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Detective Jarrold Lewis testified that on August 12, 1970 at approximately 8:10 p.m., he was dispatched to the emergency room of Reynolds Army Hospital at Ft. Sill in reference to a child beating. After having a conversation with Colleen Abel at the hospital, he returned to the police station and put out a "pickup" for the defendant. At approximately 9:00 p.m., he received information that the child had expired and returned to the hospital with a photographer. He identified State's Exhibits 1, 2 and 3 as true and correct pictorial representations of the body of Jacqueline Abel.

On cross-examination, he identified an Offense Report from the Lawton Police Department concerning a reported child

beating of Jacqueline Abel on October 30, 1969. The report reflected that the subject persons were the defendant and Colleen Abel.

Detective Morrow testified that he went to the hospital with Detective Lewis. His testimony did not differ substantially from that of Detective Lewis.

Colleen Abel testified that she had been married to the defendant for approximately three years and that they had one child, Jacqueline Marie, born on February 16, 1969. On August 12, 1970, the defendant came home between 4:30 and 5:00 p.m. The defendant had been drinking and stated that he was going to bed. At approximately 6:30 p.m., she woke up the defendant and asked him to take care of Jackie while she went to the laundromat. She testified that Jackie's condition was very fine when she left the house. At approximately 7:30, she returned to the house and the defendant stated that she would not be able to take Jackie to the doctor the next day because she "had a bruise." She asked him how she got the bruise whereupon the defendant stated, "'I got a little rougher than I thought when we were playing on the couch.'" (Tr. 37) She went into the bedroom and observed Jacqueline crawling on the bed in a circle, whimpering and moaning. She observed a bruise at the base of her back and more bruises on her stomach. She asked the defendant if she could call a doctor and he replied that "if I did I could kiss my daughter goodbye; they would take her away from us." The defendant took Jacqueline into the kitchen and gave her some juice and said that she was all right. She again asked him if she could call Doctor Harris and he replied that "if I did that he would go to jail; that I couldn't; if I loved him I would stand behind him and not call." (Tr. 38) She tried to pick up the phone and the defendant hung the phone up. When she tried to get out both the front and the back doors, he stopped her. She asked him if he had hit Jacqueline and he stated that he had hit her in the stomach. She again

begged him to allow her to call a doctor and he still refused. She picked up the child and walked into the living room. The defendant walked by her stating, "'Then all I can do is run away.'" (Tr. 38) She took the child next door and called an ambulance. She identified State's Exhibits 1, 2 and 3 as pictures of her daughter.

On cross-examination, she testified that in July, 1969, she noticed that something was wrong with Jacqueline and, upon taking her to the hospital, discovered that her leg was broken. Several weeks later, the defendant was putting Jacqueline to bed when he called her into the bedroom. She observed that Jacqueline was bleeding between her legs. In October, she took Jacqueline to the doctor for a cold and the doctor stated that she had either been abused badly or could have leukemia. The Lawton Police investigated this incident and both she and her husband took polygraph tests. A court action was instituted and Jacqueline was placed in the custody of the defendant's parents. The custody was subsequently returned to her and the defendant.

Dr. John Walsh, a pathologist, testified that he performed an autopsy on the body of Jacqueline Abel. He testified that in his opinion the cause of death was acute blood loss caused by hemorrhaging. The hemorrhaging was caused by one blunt trauma which "might be consistent with a fist." (Tr. 75)

For the defense, Sergeant Silas Nelson testified that on the morning of August 12, he, the defendant and Sergeant Lynn went to the bowling alley at Ft. Sill for lunch. They arrived at approximately 11:00 a.m. and stayed until approximately 3:30 p.m. He testified that each of them drank approximately five beers.

The defendant testified that on August 12, 1970 he was a supply sergeant at Ft. Sill. When he was eight years old, the Wesley Medical Center in Wichita, Kansas diagnosed that he was suffering from epilepsy. The diagnosis was later confirmed

in Florida when he was eleven years of age. He took medication for the affliction until he was thirteen or fourteen years old. On the day in question, he, Sergeant Lynn and Sergeant Nelson drank beer at the bowling alley. He arrived home at approximately 4:30 suffering from a severe headache. He told his wife that he was going to take several aspirins and go to bed. The next thing he remembered was his wife waking him up and stating that something was wrong with Jackie. His next recollection was being in a motel room in Ocala, Florida. The next vivid recollection was being in Henrietta, Texas and needing gasoline for his car. He attempted to hock his watch and when the service station refused to accept it he decided to risk driving home. The car ran out of gas as he turned into his driveway. The house was locked and he crawled through the bedroom window. He discovered that all of his clothes were gone and the house had apparently been abandoned. He went to the next door neighbor's house to inquire if they knew the whereabouts of his wife and daughter. When they replied that they did not, he returned home and was placed under arrest. He testified that in August, Jackie had a broken leg and that in September or October, she had an injury to her vagina. In November or December, he received a call from his wife stating that Jackie had some bruises on her head. They took her to Doctor Harris and, shortly thereafter, she was taken away from them by the court. The incident was investigated by the Lawton Police Department and both he and his wife took polygraph tests. To the best of his recollection, he did not inflict any of the injuries on Jacqueline.

Dr. William Blyth testified that he was the medical superintendent at Western State Hospital at Ft. Supply. The defendant was admitted to the hospital on August 28 for observation and remained approximately six weeks. He obtained the defendant's prior medical history from hospitals in Kansas and Florida. Three EEG tests were run on the defendant. The first test was "essentially negative." The second and third tests revealed "temporal spiking." A pitressin test was also administered to the defendant. In his opinion, based upon the prior history, the EEG results and the pitressin test, the defendant was suffering from petit mal epilepsy and masked or hidden epilepsy. He injected the defendant with sodium pentothal to ascertain if there was a possibility of malingering. He testified that, in his opinion, "either he didn't commit the crime, or if he did commit it he had a complete amnesia for so doing." He further testified that if the defendant did commit the act, at the time of so doing he would not have been able to differentiate between right and wrong.

In rebuttal, Dr. Lorraine Smith testified that she was a psychiatrist and employed as the consultant for court cases at Central State Hospital in Norman. The defendant was committed to the hospital for observation on December 8, 1970 and remained until February 5, 1971. Two EEG tests were performed on the defendant, the second while he was sleeping. She testified that if the patient was asleep, the findings of both tests were "essentially normal." She studied the prior medical history of the defendant, including the EEG tests performed at Western State Hospital, and, in her opinion, a strong willed person, such as the defendant, could refrain from revealing any information which he said he had amnesia from after being injected with sodium pentothal.

■ The first proposition asserts that the trial court erred in instructing the jury as to Manslaughter in the First Degree. The defendant argues that if the evidence showed that the defendant was guilty of a crime, it was Murder alone and that the defendant was prejudiced by the Manslaughter instruction. Defendant cites as authority Leseney v. State, 13 Okl.Cr. 247, 163 P. 956 (1917), wherein the Court stated:

"* * * The man who lies in ambush and shoots his victim or the person who deliberately administers poison can

be guilty of nothing less than murder; and under such conditions no set of crimes should be submitted to the jury from which they might carve the offense. * * *"

We are of the opinion that the trial court properly instructed the jury as to Manslaughter in the First Degree. In Clapp v. State, 73 Okl.Cr. 261, 120 P.2d 381, we stated:

"It is the duty of the court to determine as a matter of law whether the evidence is such as to justify the submission of both or either of these issues to the jury. This duty may sometimes be extremely difficult, and if there is any doubt about the matter in the mind of the court, the lower degree of the homicide should be submitted for the consideration of the jury. * * *"

We further stated in *Clapp*, supra:

"'* * * The verdict will not be disturbed on the ground the jury found defendant guilty of a lower degree of the crime charged than that established by the evidence. It sometimes happens the jury, in arriving at a verdict, does so by a compromise and fixes a lower degree than the undisputed evidence may disclose. Some states have reversed convictions under such circumstances, but, with two exceptions, this court has held the error is in favor of the accused and is not ground for a new trial. The exceptions are: Leseney v. State, 13 Okl. Cr. 247, 163 P. 956, and Lovejoy v. State, 18 Okl.Cr. 335, 194 P. 1087. These cases have been criticized and have not been followed. Irby v. State, 18 Okl. Cr. 671, 197 P. 526; Taylor v. State, 44 Okl.Cr. 58, 278 P. 1117. We are satisfied the law on this point is correctly stated in the following cases: Lytton v. State, 12 Okl.Cr. 204, 153 P. 620; Lazenby v. State, 18 Okl.Cr. 83, 192 P. 1103; Smith v. State, 20 Okl.Cr. 301, 202 P. 519; Wilmoth v. State, 20 Okl.Cr. 453, 203 P. 1055, 21 A.L.R. 590; Inman v. State, 22 Okl.Cr. 161, 210 P. 742; Taylor v. State, supra; Berry v. State, 54 Okl.Cr. 154, 18 P.2d 285.'"[1]

■ The second proposition contends that the court erred in admitting the photographs of the deceased into evidence. The defendant argues that the photographs were inflammatory and prejudicial and that no proper foundation was laid for their admission into evidence. We are of the opinion that the photographs were properly admitted. In Pate v. State, Okl. Cr., 361 P.2d 1086, we stated in the eighth and ninth paragraphs of the Syllabus:

"When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

"Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant."

The photographs in question were identified by several witnesses as being true and correct pictorial representations of the body of Jacqueline Abel as they observed her at the hospital. The pictures were not taken after extensive autopsy surgery and were not gruesome. The photographs clearly depict the various bruises upon the child's body and their probative value is not outweighed by the danger of prejudice to the defendant.

■ The final proposition asserts that the defendant was prejudiced by the court laying out or striking over portions of three instructions which had a misguiding effect on the jury. We need only observe that the defendant did not object to the court striking out the inappropriate por-

I. Walters v. State, 57 Okl.Cr. 424, 46 P.2d 875.

tions of the instructions. We further observe that the court, on two occasions, instructed the jury to disregard the portions of the instructions that had been stricken by him. We therefore hold that the defendant cannot raise this issue for the first time on this appeal.

In conclusion, we observe that the record is free of any error which would justify modification or require reversal. We are of the opinion that the punishment is richly deserved. The judgment and sentence is, accordingly, affirmed.

BLISS, P. J., and BRETT, J., concur.