Ernest Timothy HANNA, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–800.

Court of Criminal Appeals of Oklahoma.

Feb. 16, 1977.

Francis M. Pickel, Jr., Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Annis Kernan, Legal Intern, for appellee.

## OPINION

BLISS, Judge:

The Appellant, Ernest Timothy Hanna, hereinafter referred to as defendant, was charged in the District Court, Cleveland County, Case No. CRF–75–496, with the crime of Murder in the First Degree. After trial to a jury the defendant was convicted of Manslaughter in the First Degree and punishment was assessed at a term of twenty (20) years under the direction and control of the Department of Corrections of the State of Oklahoma. From a judgment and sentence in accordance with the jury's verdict, the defendant has perfected his timely appeal.

Briefly stated, the evidence adduced at trial is as follows: Dr. Tommy Hewitt, a pathologist employed by the office of the Chief Medical Examiner, testified that on the 15th day of February, 1975, he performed an autopsy upon the body of Mary Louise Wofford. As a result of said autopsy he was of the opinion that the decedent died from a ligature strangulation and blunt trauma to the abdomen. The witness further identified State's Exhibit 2 as an electrical cord which had been wrapped four times tightly around the neck of the decedent and secured in the front with a knot. He further testified that it was his opinion that the time of death was approximately 10:45 a. m. on February 14, 1975. Norman Police Detective Gerald Moody testified that at approximately 8:30 p. m. on the evening of February 14, 1975, he went to an apartment on West Robinson Street in Norman where he observed a woman's body lying in the kitchen area. Detective Myles Houseburg testified that he arrived at the apartment about 9:00 p. m. and took numerous photographs of the scene. He further stated that wrapped around the neck of the victim was the cord of an electric iron with the iron attached. He further identified a man's wedding ring which he found laying on the floor. Officer Royce Grissom then identified the decedent as Mary Louise Wofford and stated that a bedroom in the apartment appeared to have been ransacked. Officer Bill Polk then testified that on the morning of the 15th he processed the scene for latent fingerprints and that useable prints were turned over to Identification Specialist Peters.

Bob Lester, investigator for the State Medical Examiner's Office, testified that he first observed the body at the apartment at approximately 10:20 p. m. on the 14th and that the victim was lying on the kitchen floor with a ligature bound around her neck approximately four times and tied in a knot. The woman appeared to have been beaten about the head.

Numerous employees of local banks testified that the decedent had cashed certificates of deposit and withdrawn savings in the approximate amount of $5,000.00 during the early part of February. The decedent's sister testified that she had talked to her sister on the evening of the 13th and that her sister's son, Phillip Ervin, lived with Mrs. Wofford from time to time in the Norman apartment. She further stated that when she spoke to her sister she indi-

cated that her son was at home at the time. The sister further testified that the decedent had a retarded son living in Pauls Valley.

Detective Robert Kelson then testified that on February 20, 1975, he spoke with the defendant when he voluntarily came to the Norman Police Station where he was arrested on an outstanding material witness warrant, advised of his Miranda rights and questioned concerning his whereabouts at the time of the incident. The defendant related that he and Phillip Ervin drank a six-pack of beer together on the evening of the 13th and Ervin asked him what he would do for $1,200.00. The defendant replied, "Just about anything." He then related to the officer that Ervin told him that earlier that morning he observed his mother count out approximately $2,865.00 which she had withdrawn from her bank account and was going to send to her son in Pauls Valley. The defendant further stated that while en route to Mrs. Wofford's residence, Ervin declared that they would have to knock her out in order to get the money. They then went to a tavern and drank more beer and the defendant, who originally thought it would be a simple theft, decided to back out of the plan. He then left Ervin and hitchhiked to Oklahoma City where he spent the night in his apartment. He left his apartment the next day and did not return until the 20th.

Identification Specialist Larry Peters then testified that he received certain latent fingerprints from Detective Polk which had been lifted from the Wofford apartment. The prints were identified as being those of Phillip Ervin.

Tess Smith then testified that she lived in an apartment which shared a common wall with the Wofford apartment and that at approximately 10:30 p. m. on the 13th, she heard a commotion next door which she described as the sound of people running and of loud voices. She recalled hearing a woman shout, "get out of here." She further testified as to what she heard as follows:

"There were more angry voices, shouting. She continued to yell, like, 'No, no' and then a series of bumpting and thumping sounds and then 'No,' again and angry shouting from her. And the sounds continued. I could tell the sound of banging against cabinets. I was in my kitchen and it sounded very close and her repeatedly shouting in anger and then finally quiet."

She further stated that she did nothing after hearing the noises and thought it was an ordinary family quarrel. On cross-examination she stated she could not identify the woman's or man's voice and could not tell if there were more than two people involved.

Janice Craig then testified that at approximately 11:30 p. m. on the 13th, the defendant and Phillip Ervin came to her house in Jones, Oklahoma. She related that the defendant threw $6,200.00 in "Hundreds," "Fifties" and "Twenties" on the floor and stated that it was "blood money." Both the defendant and Ervin were "quite ecstatic and laughing." The witness observed blood on the defendant's face, under his fingernails and on the instep of his boot. She further stated that the defendant wanted $3,200.00 for the dirty work which he had done and kept repeating how easy it had been. The defendant told her that he had strangled the decedent with the cord of an iron and that Mrs. Wofford regained consciousness while they were ransacking the house looking for money. He then crushed the victim's neck with his boot. The witness then related that she gave the defendant a clean pair of jeans and a shirt and burned his old clothing. He further told the witness that the decedent had been killed in the dinette area of the apartment. and that he was worried about his fingerprints, stated that he had thrown some beer cans in a trash basket. He asked the witness to go to the apartment and retrieve the cans and steal jewelry to make it look like a robbery, but she refused. The defendant also described the decedent's appearance as he was in the process of strangling her. Later that night she drove the two men in the victim's car to some apart-

ments in Oklahoma City to get some drugs. When they arrived she got them the drugs and then informed them that she was not returning home that night. She further testified that she received $50.00 from the stolen money.

On cross-examination, the witness testified that she had previously used heroin, LSD and other drugs, beginning her habit when she was seventeen. She denied that the use of drugs had affected her memory, denied that Ervin said that he had killed his mother in a fit of rage and denied seeing any blood on Ervin. She admitted having obtained psychiatric help because of her drug problem. The State then rested.

The defense then called Phillip Ervin who testified that he was currently serving time for Manslaughter in the First Degree after pleading guilty to his mother's homicide. He further stated that on February 13, 1975, he and the defendant went to a tavern in Norman, drank beer and then walked to his mother's apartment to get the keys to her car. They then purchased one or two six-packs of beer and proceeded to drink it in a parking lot. The defendant made a remark about the witness' wife which caused him to hit the defendant in the mouth. The defendant then started walking north toward Oklahoma City. Approximately one-half hour later, the witness was driving toward Oklahoma City and picked up the defendant. At that time there was a large sum of money in the passenger seat about which the defendant inquired. Ervin informed him that he had been under the influence of drugs and had "flipped out" and killed his mother. They then proceeded to Janice Craig's home where he told her he had killed his mother and the money was divided.

On cross-examination he explained that he gave the defendant approximately half the money to "try to take the heat off of this deal." He further admitted testifying, under oath, during his appearance to plead guilty to his mother's homicide, that on the date in question he and the defendant had decided to knock out his mother in order to rob her; that he hit his mother in the back

of the head with an iron; that he and the defendant were ransacking the bedroom when they heard her groan; that the defendant ran back into the kitchen and stood on the victim's throat with his foot; and that they thereafter discovered the money and left in the victim's car. The witness further admitted that the statement made to justify his guilty plea was perjured and that he, alone, had killed his mother. The defense rested.

The State's first rebuttal witness was Danny Allen, a Cleveland County jailer, who testified that one night before trial the defendant had requested that Ervin be placed in the cell across the hall so that they might talk. The arrangement was made and the witness overheard the defendant ask Ervin if he was going to testify against him. Ervin responded, "No, I'm going to tell them I did it."

Steve Lamirand, a law student and part-time employee of the Sheriff's Office, testified that he heard a conversation between the defendant and another prisoner named Hill in the Cleveland County jail. He explained that the defendant and Hill talked for a few moments concerning whether Ervin was going to testify against the defendant. The defendant then told Hill that he had killed Ervin's mother in order to give Ervin more time. The defense and the State stipulated that the wedding ring was Phillip Ervin's. Both parties then rested.

■ In his first assignment of error the defendant urges that the trial court committed reversible error in failing to sustain the defendant's Demurrer to the evidence for the reason that the testimony of Janice Craig was not corroborated. We disagree. It is evident from the record that Janice Craig was not an accomplice but was an accessory. There was no evidence in the record to reflect that she participated in the planning or commission of the crime nor did she procure the commission of same. She had no knowledge of the crime until the defendant and Ervin came to her home. Not being an accomplice, the testimony of Janice Craig did not need corroboration.

See *Edmondson v. State*, Okl.Cr., 515 P.2d 1158 and the cases cited therein.

■ The defendant's second assignment of error is that the verdict of the jury was not supported by sufficient evidence for the reason that the only evidence tending to connect the defendant with the commission of the crime was testimony of the accessory, Janice Craig, who was an admitted user of drugs to the extent that her mind was affected.

■ From an examination of the record as a whole, it appears that there was sufficient competent evidence of guilt. This Court has held on many occasions that it is the exclusive province of the jury to weigh the evidence and determine the facts. Where there is competent evidence from which the jury might reasonably conclude the defendant was guilty, the case will not be reversed on appeal on a contention that the evidence is not sufficient. See *Bellows v. State*, Okl.Cr., 545 P.2d 1303 and *Logan v. State*, Okl.Cr., 493 P.2d 842.

■ The defendant's third assignment of error concerns five statements made by Janice Craig during direct examination by the prosecution. The record reflects that in two instances no objection was made by defense counsel. As stated in *Davis v. State*, Okl.Cr., 488 P.2d 932, it is the general rule of law that objections must be made in a timely manner and failure to so object constitutes waiver.

■ The first of the three remaining statements complained of by defense counsel as being prejudicial to the rights of the defendant is as follows:

"Q. (by Mr. Gaston) Okay. Just tell us what Tim said. What was the next thing that Tim said?

"A. I don't remember what the next thing that Tim said, but that they had killed—

"BY MR. HAAS: Now, Your Honor, we are going to object to this, anything that 'they' said. It is hearsay, and we desire the Court to admonish the Jury that the remarks should be stricken from the record and not considered.

"BY THE WITNESS: Could you reword it?

"BY THE COURT: The objection is sustained. I'm not sure that she was getting into hearsay, and, therefore, I would not admonish the Jury. Except I would require Counsel to rephrase the question and (to the witness) you to listen very carefully so that your answer is particularly germane to the question that the State has asked."

The objection by defense counsel appears to be an objection upon the grounds of hearsay. However, the comment by the witness appears to refer only to what the defendant told her. The witness was cautioned by the trial court to be more responsive to the questions asked. We find no prejudicial error.

The second statement complained of is as follows:

"Q. What, if anything, did Hanna tell you concerning the location of the victim?

"A. That she was in the dinette area of their apartment, her apartment, and he was worried about his fingerprints. They had . . . he had gone—

"BY MR. HAAS: Your Honor, I am going to object to her volunteering testimony here.

We would ask that the Prosecutor ask direct questions to withdraw the information he desires to elicit.

"BY THE COURT: Please ask the question to which she is to make an answer.

"BY MR. GASTON: Okay."

Defense counsel's objection goes to the narrative type response the witness was making. The trial court sustained the objection. Again we find no prejudicial error since the narrative was quite short and the prosecutor admonished.

The third statement complained of is as follows:

"Q. Did you have a conversation with him at Richard Harvey's house concerning the conversation that you had had at your house or in the car on the night of the thirteenth?

"A. No, not really. We didn't talk about the murder that much into detail—

"BY MR. HAAS: Your Honor, the lady is mumbling, and it's not responsive to the question.

"BY THE COURT: (to the witness) Did you indicate that you did not have a conversation that amounted to much at that time?

"BY THE WITNESS: Yes.

"BY THE COURT: All right. That's the answer that the Jury will consider. And you may inquire further if you desire to."

Again the comment complained of was objected to as not being responsive to the question asked. The objection was competently handled by the trial court and no fundamental right of the defendant was prejudiced.

■ The defendant's fourth assignment of error is that the trial court erred as a matter of law in failing to sustain the defendant's motion to quash the information for the reason that the evidence presented at the preliminary hearing was insufficient to bind the defendant over on a charge of murder in the first degree. However, the record before us does not contain a transcript of the preliminary hearing. Therefore, we are unable to consider the alleged error. As stated in *Henderson v. State*, 95 Okl.Cr. 342, 246 P.2d 393, it is the duty of an appellant to see that the record filed is complete. Defendant failed to provide an adequate record on appeal and the fourth assignment is without merit.

■ The defendant's fifth assignment of error is that there was insufficient evidence for the jury to return a verdict of guilty on either first or second degree murder and that the trial court, therefore, erred in its failure to sustain a demurrer to the evidence. It is obvious from a cursory reading of the record that there was substantial evidence upon which the jury could have based a verdict of guilty of the crime charged. As stated in *Towry v. State*, Okl. Cr., 540 P.2d 597, this Court has repeatedly held that where there is competent evidence reasonably tending to sustain the allegations of the charge, the trial court should

not sustain a demurrer to the evidence. It should also be noted that the defendant failed to support his assignment of error with appropriate caselaw and authority. For both reasons, the fifth assignment of error is without merit.

■ The defendant's last assignment of error urges that the trial court erred in refusing to permit the defendant to waive instructions to the jury concerning the lesser included offenses of murder in the second degree and manslaughter in the first degree. The record reveals that after both parties rested and the trial court advised the defendant and his attorney that he intended to instruct on the lesser included offenses, defense counsel advised the court as follows:

"BY MR. HAAS: Your Honor, the Defendant at least wants the opportunity to make a record, which I do not recommend. I am opposed to it as a lawyer.

"The Court and Counsel have gotten together and framed the Instructions in this case; and from a lawyer's standpoint, considering the circumstances that I have labored under and the difficulty of defending in this case, I feel that as a lawyer I am extremely lucky to get the Instructions that the Court feels under the Law he must give, which includes not only the Instruction on Murder One, but Murder Two and Manslaughter.

"Frankly, when this thing first started, I had no hope that we would have any Instructions of any lesser included offense.

"A turn of events have shown otherwise, and I have recommended to my client that he be grateful for having the Court instruct and give the Jury a chance to find him guilty of something that could save his life.

"I do recommend against what he wants to do, but he at least wants a chance to make a record for himself by making a request of the Court, unless at the last minute here he has changed his mind. But I would request of the Court that the Defendant be permitted to make his own record in this regard."

The defendant then personally took the stand and testified that he had been advised that the trial court intended to instruct not only on murder in the first degree but the lesser included offenses of murder in the second degree and manslaughter in the first degree. He further made a request that the trial court only instruct on murder in the first degree since he saw no advantage in going to the penitentiary. The trial court then advised the defendant that he had no alternative other than to instruct on the lesser included offenses, both murder in the second degree and manslaughter in the first degree, since the evidence as presented required the same. Defense counsel agreed.

It is the duty of the trial court to determine as a matter of law whether the evidence is such as to justify the submission of instructions on lesser and included offenses. This duty is often extremely difficult and if there is any doubt about the matter in the mind of the trial court a lower degree of homicide should be submitted for consideration of the jury. See *Abel v. State*, Okl.Cr., 507 P.2d 569 and *Clapp v. State*, 73 Okl.Cr. 261, 120 P.2d 381.

In the instant case there was sufficient evidence to raise a doubt in the mind of the trial court as to whether the manslaughter instruction should have been submitted to the jury. The testimony of Janice Craig, Detective Kelson and Phillip Ervin indicates that the defendant had drunk substantial amounts of beer. The trial court, in an abundance of caution, resolved any doubt concerning premeditation in favor of the defendant and properly submitted the manslaughter instruction. Therefore, for all the reasons set out above, it is our opinion that under the facts arising in this case and considering the general principles involved, the defendant cannot be heard to complain about the submission of the lesser included offense instructions. They inured to his benefit and he suffered no prejudice thereby. The defendant's final assignment of error is without merit.

From an examination of the record as a whole, it is our opinion that the defendant received a fair and impartial trial before a jury, no substantial right was prejudiced and the judgment and sentence appealed from should be, and the same is hereby, *AFFIRMED.*

BUSSEY, P. J., and BRETT, J., concur.